# EXHIBIT 1

The information available on Case.net is provided as a service and is not considered an official court record.

Case: 4:26-cv-01075   Doc. #: 1-1   Filed: 07/09/26   Page: 2 of 97 PageID #: 6

Case.net:26SL-CC04056 - HEININGER V. ELCO ADMINISTRATIVE SERVICES COMPANY (E-CASE) - Docket Entries

---

| **Respond to Selected Documents** |       **Sort by date:** Descending Ascending       **Display options:** All Entries    ⌄

**05/29/2026**

**Judge Assigned**

DIV 3

**Pet Filed in Circuit Ct**

Petition for Damages; Ex 3 - Right to Sue; Ex 4 - Employment Contract; Ex 1 - Charge of Discrimination; Ex 2 - Amended Charge of Discrimination.

    **Filed By:** LEAH ELIZABETH BECK

    **On Behalf Of:** BREANN HEININGER

**Filing Info Sheet eFiling**

    **Filed By:** LEAH ELIZABETH BECK

**06/01/2026**

**Summons Issued-Circuit**

Document ID: 26-SMCC-7580, for ELCO ADMINISTRATIVE SERVICES COMPANY Summons Attached in PDF Form for Attorney to Retrieve from Secure Case.Net and Process for Service.

**06/15/2026**

**Notice of Service**

26-SMCC-7580; Electronic Filing Certificate of Service.

**Corporation Served**

Document ID - 26-SMCC-7580; Served To - ELCO ADMINISTRATIVE SERVICES COMPANY; Served Date - 06/09/2026; Served Time - 11:26:28; Service Type - SD; Reason Description - SERV; Service Text -

26SL-CC04056

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

BREANN HEININGER,                    )
                                     )
       Plaintiff,                    )
                                     )
v.                                   )        Case No.
                                     )        Div No.
ELCO ADMINISTRATIVE SERVICES         )
COMPANY, a domestic corporation      )
                                     )
Serve: C T CORPORATION SYSTEM        )
       5661 Telegraph Rd Ste 4B      )
       Saint Louis, MO 63129-4275    )
                                     )
       Defendant.                    )

**PETITION FOR DAMAGES**

COMES NOW Plaintiff Breann Heininger (Plaintiff), by and through her undersigned counsel, and for Plaintiff's Petition against Defendant ELCO Administrative Services Company ("Defendant"), states as follows:

**INTRODUCTION**

1.     Plaintiff brings claims against Defendant to remedy violations of her rights under the Missouri Human Rights Act, the Americans with Disabilities Act, and the Family Medical Leave Act, and for breach of contract.

**PARTIES**

2.     Plaintiff Breann Heininger is a former employee of Defendant.

3.     Plaintiff is a resident of St. Charles, Missouri.

1

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

4. At all relevant times, Plaintiff met the definition of an "employee" under all applicable statutes.

5. Defendant ELCO Administrative Services Company is a corporation with a principal place of business located at 600 Corporate Park Drive, St. Louis, Missouri 63105.

6. Defendant ELCO Administrative Claims Services is a wholly-owned subsidiary of Enterprise Mobility ("Enterprise").

7. Enterprise is a company that provides transportation services, such as vehicle rental through its Enterprise, National, and Alamo brands, fleet management, carsharing, and commercial truck rental.

## PROCEDURAL REQUIREMENTS

8. On June 14, 2025, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the Missouri Commission on Human Rights (MCHR) in St. Louis, Missouri. Exhibit 1 - Charge of Discrimination.

9. On November 19, 2025, Plaintiff filed an amended charge of discrimination with the Equal Employment Opportunity Commission (EEOC) and the Missouri Commission on Human Rights (MCHR) in St. Louis, Missouri. Exhibit 2 - Amended Charge of Discrimination.

10. On or about March 2, 2026, the MCHR issued Plaintiff a Notice of Right to Sue. Exhibit 3 - Notice of Right to Sue.

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter of this action pursuant to §213.111, RSMo.

12.    Defendants' unlawful actions for which Plaintiff seeks relief occurred in St. Louis County, Missouri, therefore venue is proper in this Court.

## FACTS COMMON TO ALL COUNTS

*Background*

13.    Plaintiff began working for Enterprise in 2008.

14.    Between 2008 and 2023, Plaintiff was promoted up through the following positions:

   a.  Management Trainee,

   b.  Assistant Branch Manager,

   c.  Claims Adjuster,

   d.  Liability Supervisor, and

   e.  Talent Development Manager.

15.    Enterprise conducted annual performance reviews of Plaintiff across these roles.

16.    As Talent Development Manager, Plaintiff reported to Assistant Vice President David Tashiro ("AVP Tashiro").

17.    AVP Tashiro routinely rated Plaintiff's performance as "Exceeds Requirements," "Advanced," or "Expert" across multiple categories of review.

18.    AVP Tashiro recognized and identified Plaintiff's strengths in building relationships each year.

3

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

*Promotion and Employment Contract*

19. In August 2023, Plaintiff was promoted to Director of the Special Investigations Unit ("SIU") for Defendant ELCO.

20. The SIU team is responsible for detecting and investigating insurance fraud related to Enterprise Mobility's fleet of vehicles.

21. To accept the Director position, Defendant required Plaintiff to sign an "Employment Contract".

22. The Employment Contract is attached to this Petition as Exhibit 4.

23. The employment contract provides that Defendant may terminate Plaintiff's employment "for any reason whatsoever, which it, at its sole option, may elect." Exhibit 4 - Employment Contract, ¶ 13.

24. The employment contract provides that, in the event of such termination, "Employee shall be paid a severance benefit in an amount equal to thirty percent (30%) of the compensation for services and contingent compensation, if any, earned by him/her during the twelve full calendar months immediately preceding the month of such termination." Id.

25. The employment contract provides that as "a precondition to receiving and retaining the" the severance payment, Plaintiff must sign a document agreeing to (1) releases Defendant from any claims by Plaintiff, (2) not to disparage or denigrate any of the Employer parties, and (3) "provide reasonable consultation, cooperation and assistance as and when reasonably requested with respect to matters in which Employee was involved or had knowledge of during his/her employment with

4

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

Employer, voluntarily appear without a subpoena to testify in any legal proceeding, meet with Employer counsel prior to such testimony as and when reasonably requested and advise counsel truthfully of all facts known to Employee." Ex. 4, ¶13(i).

26. The employment contract provides "Failure to execute and deliver to Employer, and not revoke, the document identified in (i) above within the time frame provided for execution and delivery shall result in forfeiture of the severance benefit described in this paragraph 13." Ex. 4, ¶13(iii).

27. The employment contract also includes a post-employment non-compete restrictive covenant which, in summary, provides:

    a. **Temporal Scope:** Two years post-termination. Ex. 4, ¶15.

    b. **Geographic Scope:** Within 150 miles of any office where Plaintiff worked or had supervised others in the two years preceding termination. Id.

    c. **Restricted Activity:** "Employee will not directly or indirectly [...] enter into or engage in the previously specified businesses of Employer in like or similar duties, capacities, responsibilities or activities (which includes activities directly or indirectly supervised or about which Employee had proprietary information) which he/she performed for Employer." Id.

    d. **Business of the Employer:** "The Employer owns and operates businesses which provide, among other services, automotive leasing; automotive rental; new and used (including remarketing, referral activities, wholesale and retail) vehicle sales; automotive and truck fleet management; special services to automotive fleet owners, lessors, collision industry services, insurance industry adjustors and/or agents, including, but not limited to, those services provided under the trade name "Claims Connection"; car sharing, ridesharing, ride hailing, ride matching, ride booking services, vanpool services; network management services and software, accident management services and software, data driven performance software development, parts pricing and procurement software services and/or development and automotive rental reservation centers." Id. at p. 1.

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

28. To induce Plaintiff to sign the employment contract, Defendant offered and paid Plaintiff a $250.00 "signing bonus." Id.

*Essential Job Functions*

29. Plaintiff possessed the necessary qualifications and experience for the SIU Director position.

30. Essential functions of Plaintiff's Director role include, but are not limited to:

    a. Collaborating with senior leadership to promote the company's interests,

    b. supervising the SIU team in the detection and investigation of insurance fraud related to the company's fleet of vehicles,

    c. evaluating metrics for strategic planning,

    d. managing vendor relationships,

    e. engaging with external professionals, and

    f. exercising independent professional judgment.

31. Prior to being promoted to SIU Director, Plaintiff and AVP Tashiro had a good professional working relationship.

32. As SIU Director, Plaintiff continued reporting to AVP Tashiro.

33. AVP Tashiro had minimal previous experience in the management of the special investigations department.

34. In January 2024, the Assistant Vice President of Corporate Liability, Jody Reynolds, was promoted to Vice President of Liability Claims.

35. AVP Tashiro began reporting to Vice President Jody Reynolds ("VP Reynolds").

36. Plaintiff had collaborated with VP Reynolds in prior roles.

6

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

37. Prior to being promoted to SIU Director, Plaintiff and VP Reynolds had a good professional working relationship.

*Discrimination Begins*

38. In early 2024, AVP Tashiro began to criticize Plaintiff's communication style.

39. AVP Tashiro told Plaintiff that VP Reynolds was unhappy with Plaintiff's communication style.

40. AVP Tashiro did not tell Plaintiff what the issue was, or specify any changes he or VP Reynolds would like Plaintiff to make in the way she communicated at work.

41. In response to AVP Tashiro's criticism, Plaintiff sought feedback from peers and mentorship from senior employees about effective communication.

42. Plaintiff implemented some suggestions her peers and mentors made regarding effective workplace communication.

43. Despite Plaintiff's efforts to tailor her communication style to her superiors' preference, AVP Tashiro and VP Reynolds remained unreasonably critical.

44. AVP Tashiro regarded Plaintiff's ability to communicate to be impaired.

45. VP Reynolds regarded Plaintiff's ability to communicate to be impaired.

46. In June 2024, VP Reynolds directed AVP Tashiro to accompany Plaintiff on a trip to the mid-year meeting of the Coalition Against Insurance Fraud.

47. On the trip, AVP Tashiro told Plaintiff that VP Reynolds had asked him to "keep an eye" on Plaintiff at the meeting and report back.

48. Plaintiff felt this was discriminatory.

7

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

49. When Plaintiff asked how she did at the meeting, AVP Tashiro said she did well.

50. In the weeks after the meeting, AVP Tashiro became increasingly controlling, aggressive, and hostile toward Plaintiff, sometimes shouting at her.

51. When Plaintiff sought guidance from AVP Tashiro he would respond in a condescending tone or change the subject.

52. When Plaintiff independently exercised professional judgment, AVP Tashiro would discredit her efforts or disparage the results achieved.

53. Upon information and belief, AVP Tashiro also disparaged Plaintiff's professional skills to VP Reynolds, causing tension in Plaintiff's professional working relationship with her.

54. For example, while AVP Tashiro was out of Office on October 1, 2024, Plaintiff texted him seeking approval to have a skip-level meeting with VP Reynolds about an upcoming presentation and to build their professional relationship.

55. AVP Tashiro responded "not a good idea to bypass me" and refused to let Plaintiff approach VP Reynolds.

56. AVP Tashiro's continuously hostile conduct toward Plaintiff negatively impacted her mental health.

57. In October of 2024, Plaintiff sought mental health treatment from Melaney Courtice, LCSW ("LCSW Courtice").

58. LCSW Courtice diagnosed Plaintiff with Attention Deficit Hyperactivity Disorder ("ADHD"), Complex Post Traumatic Stress Disorder ("C-PTSD"), Generalized Anxiety Disorder ("GAD"), and suspected Autism Spectrum Disorder ("ASD").

8

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

59. LCSW Courtice forwarded her findings to Plaintiff's clinician Elizabeth Judd, PMHNP ("NP Judd").

60. NP Judd confirmed Plaintiff's ADHD, C-PTSD, and GAD diagnoses on or about November 22, 2024.

61. NP Judd arranged for Plaintiff to be clinically evaluated for ASD.

62. These disorders can have substantial impact on major life activities such as communication, learning, concentrating, thinking, and interacting with others.

63. Some symptoms of ADHD include:

    a. Difficulty sustaining attention in tasks;

    b. Being easily sidetracked;

    c. Difficulty organizing tasks and activities;

    d. Being more talkative than average;

    e. Being easily distracted by extraneous stimuli or unrelated thoughts;

    f. Fidgeting;

    g. Restlessness;

    h. Acting as if "driven by a motor," which may be experienced by others as difficult to keep up with; and

    i. Being abnormally talkative.

64. Some symptoms of C-PTSD include:

    a. Vivid intrusive memories, flashbacks, or repetitive dreams or nightmares that are thematically related to the traumatic events;

    b. Avoidance of people, conversations, activities, or situations reminiscent of the events;

    c. Persistent perceptions of heightened current threat;

    d. Hypervigilance;

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

e. Problems in affect regulation;

f. Persistent beliefs about oneself as diminished, defeated or worthless;

g. Feelings of shame, guilt or failure; and

h. Difficulties in sustaining relationships and in feeling close to others.

65. Some symptoms of GAD include:

a. Excessive anxiety and worry occurring more days than not for at least 6 months, about a number of events or activities, such as work performance;

b. Inability or difficulty in controlling the worry;

c. Feelings of restlessness;

d. Being easily fatigued;

e. Difficulty concentrating or mind going blank;

f. Irritability;

g. Muscle tension; and

h. Sleep disturbance.

66. Some symptoms of ASD include:

a. Deficits in social-emotional reciprocity, such as abnormal social approach, reduced affect, and difficulty initiating or responding to social interactions;

b. Deficits in nonverbal communicative behaviors used for social interaction, such as poorly integrated verbal and nonverbal communication, abnormalities in eye contact and body language, and deficits in understanding and use of gestures;

c. Deficits in developing, maintaining, and understanding relationships, such as difficulties adjusting behavior to suit various social contexts;

d. Stereotyped or repetitive speech, such as idiosyncratic phrases;

e. Rigid adherence to routines, such as difficulties with transitions and rigid thinking patterns; and

f. fixated interests that are abnormal in intensity or focus, such as excessively circumscribed or perseverative interests.

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

67. Upon information and belief, the "issues" AVP Tashiro and VP Reynolds had regarding Plaintiff's communication style are the symptoms of Plaintiff's disabilities.

68. For example, on or about November 7, 2024, AVP Tashiro summoned Plaintiff into an unscheduled video call to practice for an upcoming presentation.

69.  VP Reynolds and other members of leadership were present on the video call.

70. While Plaintiff practiced her presentation from a script, AVP Tashiro put his hands up and unmuted to loudly "shush" Plaintiff so she would stop speaking, instead of politely asking her to pause.

71. Plaintiff felt the "shushing" was disrespectful, especially in front of the leadership team.

72. After the meeting was over, Plaintiff asked AVP Tashiro to not "shush" her in front of others.

73. AVP Tashiro responded "if you don't want me to do it, don't ramble."

*First Accommodation Request and Report to Human Resources*

74. On or about November 2024, Plaintiff disclosed to AVP Tashiro that she had been diagnosed with ADHD, and was being clinically evaluated for ASD.

75. Plaintiff requested AVP Tashiro make reasonable workplace accommodations for her ADHD.

76. Specifically, Plaintiff requested that AVP Tashiro provide feedback to Plaintiff in a written format.

11

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

77. AVP Tashiro did not acknowledge Plaintiff's disclosure of her disabilities or accommodation request.

78. Shortly after disclosing her ADHD and suspected ASD diagnoses to AVP Tashiro, Plaintiff received a phone call from HR Manager Julie Kraus.

79. HR Manager Krause told Plaintiff she was not allowed to discuss her disabilities with AVP Tashiro or anyone else outside of HR.

80. Plaintiff told HR Manager Krause that Tashiro's hostile conduct felt targeted and unfair, especially considering he couldn't explain what he wanted Plaintiff to change about her communication style.

81. HR Manager Krause did nothing in response to Plaintiff's report of a hostile work environment.

82. HR Manager Krause asked Plaintiff if she needed disability accommodations to perform her job.

83. Plaintiff told HR Manager Krause that she didn't need accommodations to perform her day-to-day responsibilities, but that she would like an accommodation for how she receives feedback.

84. Specifically, Plaintiff requested that feedback on her performance be provided in writing going forward.

85. Additionally, Plaintiff requested HR's help to stop the mistreatment that AVP Tashiro had been subjecting her to because of her communication differences.

86. Specifically, Plaintiff sought patience and/or acceptance, rather than yelling, shushing, and denigrating remarks.

12

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

87. Defendant did not grant this request for accommodation.

88. Defendant did not offer or suggest any alternative accommodations.

89. Defendant did not take any action to prevent the ongoing mistreatment by AVP Tashiro.

*Disability Harassment Begins*

90. After disclosing her disabilities to Defendant, AVP Tashiro began to tailor his hostile conduct toward Plaintiff to aggravate her symptoms.

91. After disclosing her disabilities to Defendant, AVP Tashiro began to tailor his hostile conduct toward Plaintiff to make it appear as if her disabilities prevented her from doing her job.

92. In December 2024, AVP Tashiro verbally chastised Plaintiff for asking a question during a meeting for a committee Plaintiff was part of.

93. AVP Tashiro told Plaintiff she should have remained silent at the committee meeting.

94. During a video conference call on or about December 19, 2024, AVP Tashiro screamed at Plaintiff so loudly and for so long that a coworker who heard him from a different office contacted Plaintiff afterwards to see if she was okay.

95. Plaintiff was not okay, as Tashiro's screaming had considerably exacerbated her anxiety symptoms.

13

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

96. Because HR had prohibited Plaintiff from discussing her disabilities at work, Plaintiff was not able to defend herself or explain to AVP Tashiro how his screaming impacted her disabilities.

97. On at least one occasion, Tashiro shouted at Plaintiff until she became tearful.

98. On at least one occasion, Tashiro chastised Plaintiff for "being emotional."

99. On at least one occasion, Tashiro chastised Plaintiff for "looking depressed."

100. In mid-December 2024, AVP Tashiro told Plaintiff that the last person who asked him to communicate differently got fired.

101. Plaintiff felt AVP Tashiro was implying that he would fire her if she tried to stand up for herself about her need for accommodations and the ongoing disability harassment.

102. In February 2025, NP Judd confirmed Plaintiff's ASD diagnosis.

*Continued Failure to Accommodate*

103. On or about February 3, 2025, AVP Tashiro yelled at Plaintiff after a team meeting.

104. In response, Plaintiff sent AVP Tashiro a message requesting accommodations for how they communicated with each other.

105. Plaintiff proposed that it would be helpful to receive feedback in a written format instead of verbally.

106. Plaintiff proposed that it would be helpful if his feedback was direct and specific to her job performance, instead of using analogies and anecdotes which left Plaintiff to guess at his meaning.

14

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

107.    Defendant did not grant this request for accommodation.

108.    Defendant did not offer or suggest any alternative accommodations.

*Retaliation Begins*

109.    On or about February 6, 2025, AVP Tashiro told Plaintiff that she was being kept out of work-related meetings.

110.    AVP Tashiro stated "you are just a dreamer, and you are not allowed to have a seat at the table because of your communication."

111.    Plaintiff asked for an example of her communication being a problem.

112.     AVP Tashiro could not identify an example.

113.    AVP instead stated "you just talk too much."

114.    Plaintiff felt frustrated that her requests for reasonable accommodations related to communication had been ignored, but she was being punished for an unidentified "problem" with her communication style.

115.    Plaintiff texted AVP Tashiro "I want to stop being punished for being me. I'm controlled, chaperoned, intentionally left in the dark, shamed, and sometimes humiliated. I want to work with you to create an environment where I have the space to execute."

116.    AVP Tashiro responded to Plaintiff's text in person.

117.    AVP Tashiro stated "I feel like you are trying to make everything about DE&I."

118.    Upon information and belief, "DE&I" is an acronym used within Defendant's company that stands for Diversity, Equity, and Inclusion.

15

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

119. Plaintiff understood AVP Tashiro's statement regarding DE&I to mean that he was unwilling to entertain Plaintiff's continued requests for reasonable workplace accommodations and/or other equal employment opportunity matters.

*Disability Discrimination Complaint to Human Resources*

120. On February 7, 2025, Plaintiff sent an email to HR Manager Krause.

121. In the email, Plaintiff reported that she was experiencing:

   a. Negative behaviors including yelling, manipulations, and humiliation

   b. A threatening environment leaving no room for mistakes

   c. Lack of trust with constant monitoring

   d. Exclusion from meeting directly related to her role

   e. A lack of transparency and insufficient communication

   f. Unclear expectations, direction, and feedback, and

   g. Feedback based on preference rather than job requirements.

122. Plaintiff also texted HR Manager Krause, stating "I'm having a really hard time with this and I don't want it to seem like I am crying to HR" and "It's just gotten to be too bad and I am concerned about my job."

123. HR Manager Krause arranged to speak with Plaintiff about her report in person on February 10, 2025.

124. On February 10, 2025, Plaintiff again reported to HR Manager Krause the hostile conduct to which she was being subjected by AVP Tashiro.

125. At the conclusion of the meeting, HR Manager Krause told Plaintiff that HR would not formally investigate her report.

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

126. HR Manager Krause stated she believed this was "a performance issue."

127. HR Manager Krause told Plaintiff that she would have "a discussion" with AVP Tashiro.

128. On February 11, 2025, Plaintiff briefly met with AVP Tashiro in his office.

129. Plaintiff asked what business factors motivated ongoing efforts to change the method by which data are shared between software platforms used by her SIU team.

130. Plaintiff's intent was to understand what goal the proposed changes were designed to achieve.

131. AVP Tashiro acted as if he was irritated or offended by Plaintiff's question.

132. AVP Tashiro told Plaintiff that he needed to take another call, so Plaintiff left his office.

133. On February 12, 2025, AVP Tashiro met with Plaintiff in her office.

134. AVP Tashiro stated he stopped by to give her verbal feedback on her "professional development."

135. AVP Tashiro chastised Plaintiff for questioning his decisions regarding the software data sharing.

136. Plaintiff responded that she had not meant to "question" him, but to understand how the proposed changes supported the team's objectives.

137. Plaintiff told AVP Tashiro she felt he frequently makes assumptions about what she is thinking and why, instead of listening to understand what she actually says.

138. AVP Tashiro told Plaintiff that she should only speak when what she has to say adds value.

17

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

139. Plaintiff responded "we seem to have different perceptions of what adds value."

140.  On or about February 13, 2025, HR Manager Krause had a discussion regarding Plaintiff's report with AVP Tashiro.

141. On February 18, 2025, HR Manager Krause informed Plaintiff that HR now believed that there was "a communication issue."

142. HR Manager Krause told Plaintiff that HR was going to conduct an investigation in Plaintiff's reports.

143. Upon information and belief, HR did not conduct an investigation into Plaintiff's reports.

*Further Harassment and Retaliation*

144. On or about March 3-5, 2025, Plaintiff and AVP Tashiro traveled together for a work conference.

145. While at the airport to return home, AVP Tashiro asked Plaintiff to give him an update on a project she had been assigned by VP Reynolds.

146. While Plaintiff gave the impromptu update, AVP Tashiro interrupted multiple times to contradict information provided by VP Reynolds.

147. While discussing the project, AVP Tashiro accidentally showed Plaintiff that he had a timer running on his phone.

148. AVP Tashiro told Plaintiff that he had been timing her to see how long it took her "to get to the point."

149. Plaintiff felt this was discriminatory on the basis of her disability.

18

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

150. Plaintiff attempted to refocus the discussion back on the project.

151. AVP Tashiro continued to interrupt, raised his voice, and used an angry tone.

152. AVP Tashiro's conduct drew the attention of other travelers.

153. Plaintiff asked to pause the discussion until later.

154. AVP Tashiro agreed to pause the discussion.

155. A short time later, Plaintiff and Tashiro continued the discussion via text.

156. In her texts to AVP Tashiro, Plaintiff stated:

   a. "I feel awful about what just went down. I don't want to be in this weird place with you."

   b. "I know that I could have explained it better or faster but it sometimes feels like that movie Dodgeball where the guy is chucking wrenches. You time me but interrupted me over and over again. That disruption, to me, is also a misuse of time that we could otherwise collaborate."

   c. "When I can't finish a sentence without being interrupted, it's difficult. That sets me back in the flow of conversation and I have to keep refreshing my thought process."

   d. "The team has accomplished a lot since I took the helm. I am not asking for any special award for that but I am asking for respect and fair expectations."

   e. "I can't help but wonder if or when [Plaintiff's predecessor] was held to the expectations that I am."

   f. "This is me speaking up for myself."

157. After returning from the conference, AVP Tashiro told Plaintiff he made audio recordings of her participation at the conference.

158. AVP Tashiro told Plaintiff he recorded her so that he could share the recordings with other people.

159. Upon information and belief, AVP Tashiro shared the recordings with VP Reynolds.

19

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

160. The unfair, combative, and punitive treatment Plaintiff experienced negatively impacted her mental health.

161. Plaintiff was diagnosed with Major Depressive Disorder ("MDD") in the spring of 2025.

162. MDD can have a substantial impact on major life activities such as socialization and employment.

163. Symptoms of MDD include:

    a. depressed mood

    b. diminished interest in daily activities

    c. insomnia

    d. psychomotor agitation

    e. fatigue

    f. feeling excessive or inappropriate guilt

    g. diminished ability to concentrate, and

    h. indecisiveness

164. On or about March 27, 2025, AVP Tashiro presented Plaintiff with her annual performance review.

165. AVP Tashiro was responsible for evaluating Plaintiff's performance annually.

166. Some categories for which Plaintiff previously had been rated as "Exceeds Requirements," "Advanced," or "Expert" were now rated as "Basic."

167. AVP Tashiro told Plaintiff that her ratings were primarily driven by "senior management."

168. Plaintiff understood AVP Tashiro to be referring to VP Reynolds.

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

169. AVP Tashiro was referring to VP Reynolds.

170. AVP Tashiro said that he would rate Plaintiff's performance lower if she did not "fix" her relationship with VP Reynolds.

171. On or about April 22, 2025, Plaintiff worked from home so she could care for her sick child.

172. Plaintiff joined a video call that included VP Reynolds.

173. Plaintiff's camera was on, showing that she was wearing a ribbed knit mock-neck sweater.

174. Plaintiff's sweater was appropriate business casual attire pursuant to Defendant's policies.

175. On April 23, 2025, AVP Tashiro issued an informal counseling to Plaintiff for wearing unprofessional attire on April 22, 2025.

176. Upon information and belief, AVP Tashiro issued the informal counseling at the direction of VP Reynolds.

177. On April 28, 2025, Plaintiff spoke to HR Manager Krause about the status of the investigation into her reports.

178. HR Manager Krause told Plaintiff that AVP Tashiro and VP Reynolds would not make any accommodations.

179. HR Manager Krause told Plaintiff she needed to decide if she wanted to continue working in the role.

180. Plaintiff felt that Defendant was trying to get her to quit.

21

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

181.   On April 29, 2025, Plaintiff and AVP Tashiro traveled to Chicago for a work conference.

182.   AVP Tashiro barely spoke to Plaintiff while traveling or during the conference.

183.   At the conference, AVP Tashiro appeared to make tally marks notes any time Plaintiff asked a question or spoke.

*Additional Oppositional Activity and Reports of Hostile Work Environment*

184.   On April 30, 2025, Plaintiff informed HR Manager Krause that AVP Tashiro had been tallying every time she spoke during the conference.

185.   Plaintiff told HR Manager Krause:

   a.   "Literally every time I spoke or asked a question he started writing in the side of his notebook."

   b.   "I was so self-conscious and anxious, worried he was, like, counting and judging everything I said. It's difficult to be myself and think critically when I also have to be so worried about what kind of report card I am going to get later."

   c.   "The stress and anxiety of it all is seriously taking a toll on me mentally and physically."

   d.   "My goal is not to stir anything up."

   e.   "I think he doesn't want to talk to me because he is worried that whatever he says or does will get back to you. I don't know how he and I move forward like that."

186.   HR Manager Krause responded "I think you both want to see an improvement in your ability to work together and make progress with your team's goals. If there is anything I can do, just [let me know]."

187.   Upon information and belief, HR did not conduct any investigation into Plaintiff's report of AVP Tashiro's tallying.

22

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

188. On or about the first week of May, 2025, Plaintiff experienced a life-threatening mental health crisis.

189. Plaintiff's clinicians determined that the unfair treatment she was experiencing at work was having a serious negative impact on her mental health.

190. Plaintiff's clinicians determined that it was medically necessary for Plaintiff to take medical leave from work.

191. Plaintiff's clinicians determined that it was medically necessary for Plaintiff to receive active treatment.

192. On or about May 4, 2025, Plaintiff notified HR of her need for medical leave.

193. On May 5, 2025, LCSW Courtice sent a letter to Defendant in support of Plaintiff's request for medical leave.

194. LCSW Courtice explained that Plaintiff was under her care for Major Depressive Disorder, General Anxiety Disorder, Post Traumatic Stress Disorder, and Attention Deficit Disorder.

195. LCSW Courtice wrote:

   a. "Breann has been very engaged in making progress in therapy and has been making valiant efforts to work on the limitations imposed by her mental health and trauma-related issues."

   b. "Unfortunately, her work in a high-stress and emotionally triggering environment has been a significant barrier to her efforts at improving. It has hindered her progress by causing persistent, significant emotional distress."

   c. "Breann is presently experiencing a catastrophic mental health condition, characterized by severe anxiety and major depressive symptoms."

   d. "In my clinical opinion, this condition qualifies as catastrophic due to the severity and impact on occupational functioning."

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

e. "I am recommending a medical leave of absence for a minimum of 4 weeks, during which they will be undergoing active treatment, including psychotherapy, medication management, and psychiatric support."

196. Plaintiff timely completed and returned the documentation necessary to take job-protected Family and Medical Leave Act ("FMLA") leave.

197. Defendant approved Plaintiff's FMLA leave.

198. Plaintiff timely completed and returned the documentation necessary to use her Short Term Disability ("STD") benefits.

199. Plaintiff met the criteria to receive STD benefits.

200. On May 13, 2025, Defendant denied Plaintiff's use of her STD benefits.

201. Defendant stated summarily that Plaintiff did not meet the criteria to use her STD benefits.

202. Plaintiff felt that Defendant's denial was retaliatory and in bad faith.

203. On May 15, 2025, Plaintiff appealed Defendant's denial of her STD benefits.

204. In her appeal, Plaintiff stated:

a. "I am concerned that the reasoning provided for the STD denial lacked specificity and does not appear consistent with the information submitted by my licensed medical providers."

b. "Both my psychiatrist and therapist submitted documentation certifying that I am medically unable to work due to a catastrophic condition. Their statements outlined the disabling impact of my diagnoses—Autism Spectrum Disorder, ADHD, Complex PTSD, Generalized Anxiety Disorder (GAD), and Major Depressive Disorder (MDD)—and the significant exacerbation of those conditions due to workplace circumstances."

c. "These diagnoses were formally established following an extended effort on my part to address communication challenges through internal and external mentoring, self-guided learning, and professional development."

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

d. "After disclosing these diagnoses in good faith, I filed a formal workplace complaint documenting a psychologically unsafe environment characterized by exclusion from meetings, gaslighting, humiliation, unclear expectations, and toxic leadership behaviors."

e. "The same department that reviewed this complaint appears to have also been a part of the decision to issue the STD denial, which raises serious concerns about fairness and potential conflicts of interest."

f. The denial of STD benefits—despite extensive clinical support—has not only introduced the possibility of substantial financial strain but has further worsened my mental health during a medically vulnerable period. This outcome is especially difficult given that the intent of STD benefits is to provide support during periods of serious medical need, and that this denial appears to disregard both the medical evidence and the broader context."

*Constructive Discharge*

205. On May 19, 2025, Defendant affirmed its denial, stating summarily "we have determined that your request does not meet the criteria for a catastrophic illness or extended disability as defined by our policy."

206. Defendant did not explain why it disregarded LCSW Courtice's clinical opinion that Plaintiff's condition "qualifies as catastrophic due to the severity and impact on occupational functioning."

207. Plaintiff's employment with Defendant ended effective May 22, 2025.

208. Between May 19 and June 9, 2025, Plaintiff corresponded with HR Manager Krauss to negotiate the severance agreement required by Plaintiff's employment contract as a precondition to receiving the severance benefit.

209. On May 27, 2025, Plaintiff requested that the severance agreement include "a carveout that would allow me to pursue employment in roles related to insurance handling, claims administration, risk management, or investigative services—

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

including with companies that may have clients in rental, fleet, or leasing industries—provided the work does not directly compete with Enterprise Mobility's core operations or involve the use of proprietary strategies or data."

210. On May 29, 2025, Plaintiff further explained "I have no issue with never sharing any proprietary information, but I would obviously need to utilize general experience gained during my time with Enterprise. If you can verify that there is no problem with me seeking future employment in that capacity, I am fine with signing."

211. On June 2, 2025, HR Manager Krause responded denying Plaintiff's request, stating "if you have a specific opportunity that you would like us to consider, you should submit your request in writing so that our leaders can review and consider it."

212. On June 3, 2025, Plaintiff responded "I've reviewed the most recent version of the agreement and, while I genuinely want to reach resolution and move forward, there are still elements I'm not comfortable accepting in their current form. In particular, the scope of the noncompete remains too broad and could significantly limit my ability to work in my field. I also cannot agree to the suggestion that I submit prospective future employers to the company in writing for pre-approval. That approach feels invasive and impractical, especially given that my employment has already been terminated."

213. On June 4, 2025, HR Manager Krause responded that Defendant was "willing to limit the non-competition agreement to competitive activities for, with, or on behalf of automobile rental and automobile leasing companies."

26

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

214. HR Manager Krause sent Plaintiff a revised severance agreement reflecting this limitation.

215. After reading the revised agreement, Plaintiff responded to HR Manager Krause:

   a. "After reviewing the updated language, I'd like to request one final clarification to ensure the provision is aligned with the realities of how SIU work is conducted."

   b. "As currently written, the clause could be interpreted to prohibit oversight of investigative work performed by third-party administrators, carriers, or firms that serve a variety of clients — including rental or leasing companies. This may unintentionally restrict otherwise non-competitive roles where my involvement is indirect or incidental."

   c. "I want to be transparent in saying that I will not be able to agree to any language that would restrict me from working in leadership or oversight roles within the broader insurance and investigations industry—particularly when those roles do not involve direct solicitation of, or exclusive work for, rental or leasing companies. The restrictions as currently proposed remain too broad and do not reflect the operational structure or collaborative norms of this field."

216. One June 9, 2025, HR Manager Krause responded, stating "We will not agree to make additional changes to the Agreement," and "To the extent you would like to sign the Agreement as written, please let me know and I will send it to you via DocuSign."

217. Plaintiff felt that Defendant's refusal to agree to terms permitting her to obtain comparable, non-competitive employment was retaliatory and in bad faith.

218. The final version of the severance agreement acceptable to Defendant was transmitted to Plaintiff on June 10, 2025.

219. Defendant's severance agreement contained terms in excess of those set by Plaintiff's employment contract as sufficient to receive the severance benefit.

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

220. For example, the severance agreement included additional terms:

    a. Requiring Plaintiff to immediately notify the company if she is contacted by an adverse party in litigation;

    b. Forbidding Plaintiff from taking any affirmative act to assist any plaintiff suing the company; and

    c. Forcing Plaintiff to agree that she will never apply for employment or re-employment with the company or any of its related entities, and that any such entity may refuse to employ her without liability.

    d. Creating a non-disclosure obligation, that "None of the terms and conditions of this Agreement (including any negotiations leading hereto) either have been or shall be made public by Employee or be disclosed by her to any person other than her immediate family, accountant and/or other financial advisor and attorney, or as may be required by valid court order, without the express prior written consent of Enterprise Mobility."

221. The severance agreement also contained terms that were inconsistent with each other, for example:

    a. In Paragraph 10, the agreement forces Plaintiff to execute a comprehensive release of all claims, explicitly including any "whistleblower" claims. Yet, the very next paragraph creates a carve-out stating that she is "expressly permitted to accept a whistleblower award directly from the SEC."

    b. Paragraph 21 states that the rights and obligations of the agreement "shall benefit and be binding upon the parties hereto and their respective heirs, personal representatives, successors and assigns." However, Paragraph 24 explicitly states that the employee's death "shall automatically terminate the Agreement and all future obligations of Enterprise Mobility hereunder, including the obligation to make any yet-unpaid periodic severance payments."

    c. The agreement states that nothing prohibits Plaintiff from providing information to a court, administrative agency, or regulatory body in response to a lawful request or subpoena, nor does it interfere with her right to cooperate with agencies like the EEOC or NLRB. However, Paragraph 11 strictly forbids her from taking "any affirmative act to initiate contact with, or otherwise offer any form of assistance to [...] any plaintiff or plaintiff's representative in any litigation" involving Defendant.

222. The severance agreement also contained terms that were illusory, for example:

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

    a.  Paragraph 16 states that Defendant will instruct Plaintiff's VP Reynolds and AVP Tashiro not to disparage her. However, the next sentence states that the company "is not responsible for any conduct of its employees and/or agents acting without the specific knowledge and authorization" of Defendant.

223.  The severance agreement also contained terms that were unconscionable, for example:

    a.  Paragraph 16 creates an incredibly overbroad "media silence" obligation, barring Plaintiff from communicating "any information concerning Enterprise Mobility" to the general public or the media without Defendant's prior written consent, even if that information is already available to the general public;

    b.  Paragraph 20 states that Defendant is excused from performance under the agreement if it decides, "at its sole determination, that Employee has breached any term" of the agreement.

    c.  Paragraph 23 states that "Enterprise Mobility, at its sole option, may cancel this Agreement upon written notice to Employee and any and all sums previously paid by Enterprise Mobility to Employee hereunder shall be repaid by Employee, to Enterprise Mobility, within thirty (30) days of such written notice" if Plaintiff "contests the enforceability of application of" any part of the agreement.

    d.  Paragraph 26 forces Plaintiff to affirmatively deny that Defendant "or their employees, partners, supervisors, representatives, or agents have ever committed any wrongdoing whatsoever with respect to Employee's employment with Enterprise Mobility. Employee and Enterprise Mobility agree that they are not a prevailing party."

224.  Plaintiff felt that Defendant's insistence on additional, inconsistent, illusory, and unconscionable terms was retaliatory and in bad faith.

225.  Plaintiff declined to sign Defendant's severance agreement.

226.  On or about June 19, 2025, Plaintiff filed for unemployment.

227.  On June 23, 2025, Plaintiff filed a charge of discrimination against Defendant with the Missouri Commission on Human Rights and Equal Employment Opportunity Commission.

29

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

228. Plaintiff's charge of discrimination was transmitted to Defendant on June 27, 2025.

*Post-Charge Retaliation*

229. On July 9, 2025, Defendant presented information to the Missouri Division of Employment Security in response to Plaintiff's unemployment claim.

230. Defendant represented to the Missouri Division of Employment Security:

   a. "Elco Administrative Services Company denies that Ms. Heininger was "excluded from critical meetings and communications, denied opportunities to speak, and eventually blocked from returning to work despite requesting short-term disability and support."

   b. "Ms. Heininger chose to resign."

   c. "Ms. Heininger never requested assistance or accommodations to assist her in returning to work, and Elco Administrative Services Company never denied Ms. Heininger any accommodations or leaves of absence."

231. Based on the information Defendant presented to the Missouri Division of Employment Security, Plaintiff's claim was denied.

232. The information Defendant presented to the Missouri Division of Employment Security was false.

233. Plaintiff felt Defendant's presentation of false information to the Missouri Division of Employment Security was retaliatory and in bad faith.

234. Plaintiff appealed the denial of her unemployment claim.

235. On August 14, 2025, the Appeals Tribunal conducted a hearing on Plaintiff's appeal.

236. The Appeals Tribunal issued its decision on August 18, 2025.

237. The Appeals Tribunal concluded that the termination of Plaintiff employment was attributable to Defendant.

30

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

**COUNT I**

**Missouri Human Rights Act**

*Disability Discrimination - Mo. Rev. Stat. § 213.055*

238. Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

239. Plaintiff is an individual.

240. Defendant is engaged in an industry affecting commerce.

241. Defendant employs fifteen (15) or more employees.

242. Defendant employs five hundred (500) or more employees.

243. Defendant employed Plaintiff.

244. Plaintiff could perform the essential functions of her Director position with or without reasonable accommodation.

245. In February 2024, Defendant regarded Plaintiff as an individual with a disability.

246. On or after February 2024, Defendant's management-level employees discriminated against Plaintiff in the terms, conditions, and privileges of employment by, including but not limited to:

    a. Sending AVP Tashiro to "keep an eye on" and to "report back" about Plaintiff's participation at the Coalition Against Fraud Conference;

    b. Engaging with Plaintiff in a controlling, aggressive, hostile, and disparaging manner;

    c. Permitting AVP Tashiro to engage with Plaintiff in a controlling, aggressive, hostile, and disparaging manner; and

    d. Prohibiting Plaintiff from interacting with members of leadership.

31

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

247. Defendant's actions against Plaintiff were motivated by Defendant regarding Plaintiff as an individual with a disability.

248. Plaintiff has Attention Deficit Hyperactivity Disorder ("ADHD").

249. ADHD is a mental or psychological disorder.

250. ADHD substantially limits major life activities which affect employability, such as communication, self-care, socialization, and employment.

251. Defendant was aware of Plaintiff's ADHD diagnosis on or about November 2024.

252. Plaintiff has Autism Spectrum Disorder ("ASD").

253. ASD is a mental or psychological disorder.

254. ASD substantially limits major life activities which affect employability, such as communication, self-care, socialization, and employment.

255. Defendant was aware that Plaintiff was being clinically assessed for ASD on or about November 2024.

256. On or after November 2024, Defendant's management-level employees discriminated against Plaintiff in the terms, conditions, and privileges of employment by, including but not limited to:

   a. Prohibiting her from discussing her disabilities with anyone outside of HR;

   b. Refusing to investigate Plaintiff's November 2024 report of hostile work environment;

   c. Chastising Plaintiff for asking questions at her committee meeting;

   d. Screaming at Plaintiff;

   e. Chastising Plaintiff for "being emotional";

   f. Chastising Plaintiff for "looking depressed";

32

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

g. Threatening to fire Plaintiff;

h. Keeping Plaintiff out of work-related meetings;

i. Telling Plaintiff she talks too much;

j. Chastising Plaintiff for talking about diversity, equity, and inclusion;

k. Mischaracterizing Plaintiff's February 7 and 10, 2025 reports of a hostile work environment as "a performance issue";

l. Chastising Plaintiff for asking questions about her job;

m. Surreptitiously recording Plaintiff's participation at the conference to share with other people;

n. Prohibiting Plaintiff from speaking unless AVP Tashiro felt it would add value;

o. Surreptitiously using a stopwatch to time how long Plaintiff spoke;

p. Giving Plaintiff a negative performance review;

q. Issuing pretextual discipline regarding Plaintiff's work attire;

r. Surreptitiously tallying each time Plaintiff spoke at the conference;

s. Ostracizing Plaintiff;

t. Refusing to investigate Plaintiff's April 30, 2025 report of hostile work environment;

257. Defendant's actions against Plaintiff were motivated by Plaintiff's ADHD and/or ASD.

258. As a result of the discriminatory treatment, Plaintiff began experiencing symptoms of MDD.

259. Plaintiff has Major Depressive Disorder ("MDD").

260. MDD is a mental or psychological disorder.

261. MDD substantially limits major life activities which affect employability, such as communication, self-care, socialization, and employment.

33

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

262. Defendant was aware of Plaintiff's MDD diagnosis on or about May 5, 2025.

263. Plaintiff has Generalized Anxiety Disorder ("GAD").

264. GAD is a mental or psychological disorder.

265. GAD substantially limits major life activities which affect employability, such as communication, self-care, socialization, and employment.

266. Defendant was aware of Plaintiff's GAD diagnosis on or about May 5, 2025.

267. Plaintiff has Complex Post Traumatic Stress Disorder ("C-PTSD").

268. C-PTSD is a mental or psychological disorder.

269. C-PTSD substantially limits major life activities which affect employability, such as communication, self-care, socialization, and employment.

270. Defendant was aware of Plaintiff's PTSD diagnosis on or about May 5, 2025.

271. On or after May 5, 2025, Defendant's agents and management-level employees discriminated against Plaintiff in the terms, conditions, and privileges of employment by, including but not limited to:

   a. Denying Plaintiff use of STD benefits;

   b. Disregarding Plaintiff's clinician's medical certifications;

   c. Denying Plaintiff's appeal of the STD benefit denial; and

   d. Constructively discharging Plaintiff.

272. Defendant's actions against Plaintiff were motivated by Plaintiff's ADHD, ASD, MDD, GAD, and/or C-PTSD.

273. The agents, servants, and employees of Defendant, identified herein, were at all such times acting within the scope and course of their agency and employment; and/or

34

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

their actions were expressly authorized by Defendant; and/or their actions were ratified by Defendant, thus making Defendant liable.

274. Defendant's conduct was outrageous because of its evil motive or reckless indifference to the rights of Plaintiff, and/or intentionally harmed Plaintiff without just cause, thereby making Defendant liable for punitive damages in an amount that will punish Defendant and deter Defendant and others from like conduct.

275. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered economic harms, including but not limited to lost wages and other employment benefits.

276. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered non-economic harms, including but not limited to garden variety emotional distress, loss of dignity, fear, anxiety, dread, humiliation, inconvenience, mental anguish, embarrassment, and deprivation of her civil rights.

277. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered non-economic harms, including but not limited to emotional distress of sufficient severity to be medically significant.

278. While being discriminated against, Plaintiff developed MDD due to the stress of the ongoing discrimination.

279. Plaintiff's MDD was sufficiently severe to require medical treatment.

280. In addition, Plaintiff has incurred and will continue to incur attorneys' fees, costs, and expenses of suit.

35

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

281. Plaintiff is entitled to recover reasonable attorneys' fees and costs from Defendant, as provided in § 213.111.2, RSMo.

WHEREFORE, Plaintiff requests that this Court, after trial by jury, enter judgment against Defendant and in her favor on Count I of this Petition and for a finding that she has been subjected to unlawful discrimination prohibited by § 213.055, RSMo; for actual, compensatory, and/or punitive damages in such an amount in excess of $25,000.00 as is deemed fair and reasonable; for prejudgment interest, as allowed by law; for reasonable attorneys' fees, costs and expenses of litigation; for injunctive relief or other appropriate equitable relief; and for such other relief as this Court deems just and proper.

## COUNT II

### Missouri Human Rights Act

*Failure to Accommodate - Mo. Rev. Stat. § 213.055*

282. Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

283. On or about November 2024, Plaintiff made a request for reasonable accommodations related to her ADHD to AVP Tashiro.

284. Defendant failed or refused to engage Plaintiff in an interactive process.

285. Defendant failed to accommodate Plaintiff.

286. On or about November 2024, Plaintiff made a request for reasonable accommodations related to her ADHD to HR Manager Krause.

287. Defendant failed or refused to engage Plaintiff in an interactive process.

288. Defendant failed to accommodate Plaintiff.

36

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

289. On or about February 3, 2025, Plaintiff made a request for reasonable accommodations related to her ADHD to AVP Tashiro.

290. Defendant failed or refused to engage Plaintiff in an interactive process.

291. Defendant failed to accommodate Plaintiff.

292. On or about April 28, 2025, HR Manager Krause told Plaintiff that AVP Tashiro and VP Reynolds would not make any accommodations.

293. Defendant failed or refused to engage Plaintiff in an interactive process.

294. Defendant failed to accommodate Plaintiff.

295. The agents, servants, and employees of Defendant, identified herein, were at all such times acting within the scope and course of their agency and employment; and/or their actions were expressly authorized by Defendant; and/or their actions were ratified by Defendant, thus making Defendant liable.

296. Defendant's conduct was outrageous because of its evil motive or reckless indifference to the rights of Plaintiff, and/or intentionally harmed Plaintiff without just cause, thereby making Defendant liable for punitive damages in an amount that will punish Defendant and deter Defendant and others from like conduct.

297. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered economic harms, including but not limited to lost wages and other employment benefits.

298. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered non-economic harms, including but not limited to garden variety emotional

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

distress, loss of dignity, fear, anxiety, dread, humiliation, inconvenience, mental anguish, embarrassment, and deprivation of her civil rights.

299. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered non-economic harms, including but not limited to emotional distress of sufficient severity to be medically significant.

300. While being discriminated against, Plaintiff developed MDD due to the stress of the ongoing failure to accommodate.

301. Plaintiff's MDD was sufficiently severe to require medical treatment.

302. In addition, Plaintiff has incurred and will continue to incur attorneys' fees, costs, and expenses of suit.

303. Plaintiff is entitled to recover reasonable attorneys' fees and costs from Defendant, as provided in § 213.111.2, RSMo.

WHEREFORE, Plaintiff requests that this Court, after trial by jury, enter judgment against Defendant and in her favor on Count II of this Petition and for a finding that she has been subjected to unlawful discrimination prohibited by § 213.055, RSMo; for actual, compensatory, and/or punitive damages in such an amount in excess of $25,000.00 as is deemed fair and reasonable; for prejudgment interest, as allowed by law; for reasonable attorneys' fees, costs and expenses of litigation; for injunctive relief or other appropriate equitable relief; and for such other relief as this Court deems just and proper.

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

## COUNT III

## Missouri Human Rights Act

*Hostile Work Environment - Mo. Rev. Stat. § 213.055*

304. Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

305. Defendant's harassment against Plaintiff was motivated by Plaintiff's ADHD, ASD, MDD, GAD, and/or C-PTSD.

306. Defendant's harassment toward Plaintiff was unwelcome.

307. The harassment created an objectively hostile or abusive work environment that a reasonable person would find hostile or abusive.

308. The harassment created a work environment that Plaintiff perceived to be hostile and abusive.

309. The harassment was sufficiently severe and/or pervasive to affect a term, condition, or privilege of Plaintiff's employment.

310. Defendant possessed both actual and constructive knowledge of the hostile work environment to which Plaintiff was subjected.

311. Despite having both actual and constructive knowledge, Defendant failed to take appropriate and effective steps reasonably calculated to stop or mitigate the harassment that created the hostile work environment.

312. The agents, servants, and employees of Defendant, identified herein, were at all such times acting within the scope and course of their agency and employment; and/or

39

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

their actions were expressly authorized by Defendant; and/or their actions were ratified by Defendant, thus making Defendant liable.

313. Defendant's conduct was outrageous because of its evil motive or reckless indifference to the rights of Plaintiff, and/or intentionally harmed Plaintiff without just cause, thereby making Defendant liable for punitive damages in an amount that will punish Defendant and deter Defendant and others from like conduct.

314. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered economic harms, including but not limited to lost wages and other employment benefits.

315. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered non-economic harms, including but not limited to garden variety emotional distress, loss of dignity, fear, anxiety, dread, humiliation, inconvenience, mental anguish, embarrassment, and deprivation of her civil rights.

316. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered non-economic harms, including but not limited to emotional distress of sufficient severity to be medically significant.

317. While being subjected to a hostile work environment, Plaintiff developed MDD due to the stress of the ongoing harassment.

318. Plaintiff's MDD was sufficiently severe to require medical treatment.

319. In addition, Plaintiff has incurred and will continue to incur attorneys' fees, costs, and expenses of suit.

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

320. Plaintiff is entitled to recover reasonable attorneys' fees and costs from Defendant, as provided in § 213.111.2, RSMo.

WHEREFORE, Plaintiff requests that this Court, after trial by jury, enter judgment against Defendant and in her favor on Count III of this Petition and for a finding that she has been subjected to unlawful discrimination prohibited by § 213.055, RSMo; for actual, compensatory, and/or punitive damages in such an amount in excess of $25,000.00 as is deemed fair and reasonable; for prejudgment interest, as allowed by law; for reasonable attorneys' fees, costs and expenses of litigation; for injunctive relief or other appropriate equitable relief; and for such other relief as this Court deems just and proper.

## COUNT IV

### Missouri Human Rights Act

*Retaliation - Mo. Rev. Stat. § 213.070*

321. Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

322. Plaintiff engaged in protected oppositional activity on or about November 2024 when she reported the hostile work environment to HR Manager Krause.

323. On or after November 7, 2024, Defendant retaliated against Plaintiff by,

    a. Prohibiting her from discussing her disabilities with anyone outside of HR;

    b. Refusing to investigate Plaintiff's November 2024 report of hostile work environment;

    c. Chastising Plaintiff for asking questions at her committee meeting;

    d. Screaming at Plaintiff;

41

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

e.  Chastising Plaintiff for "being emotional";

f.  Chastising Plaintiff for "looking depressed";

g.  Threatening to fire Plaintiff;

h.  Keeping Plaintiff out of work-related meetings;

i.  Telling Plaintiff she talks too much;

j.  Chastising Plaintiff for talking about diversity, equity, and inclusion;

k.  Mischaracterizing Plaintiff's February 7 and 10, 2025 reports of a hostile work environment as "a performance issue";

l.  Chastising Plaintiff for asking questions about her job;

m.  Surreptitiously recording Plaintiff's participation at the conference to share with other people;

n.  Prohibiting Plaintiff from speaking unless AVP Tashiro felt it would add value;

o.  Surreptitiously using a stopwatch to time how long Plaintiff spoke;

p.  Giving Plaintiff a negative performance review;

q.  Issuing pretextual discipline regarding Plaintiff's work attire;

r.  Surreptitiously tallying each time Plaintiff spoke at the conference;

s.  Ostracizing Plaintiff; and

t.  Refusing to investigate Plaintiff's April 30, 2025 report of hostile work environment.

324.  Plaintiff engaged in protected oppositional activity on or about February 7, 2025 when she reported the hostile work environment to HR Manager Krause again.

325.  On or after November 7, 2025, Defendant retaliated against Plaintiff by:

a.  Denying Plaintiff use of STD benefits;

b.  Disregarding Plaintiff's clinician's medical certifications;

c.  Denying Plaintiff's appeal of the STD benefit denial;

d.  Constructively discharging Plaintiff;

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

e.  Refusing to engage in good faith with Plaintiff's attempts to negotiate and execute a severance agreement satisfactory to Defendant so that she could receive the severance benefit provided under her employment contract.

326.  Plaintiff engaged in protected oppositional activity on or about June 23, 2025, when she filed a charge of discrimination against Defendant with the Missouri Commission on Human Rights and Equal Employment Opportunity Commission.

327.  On or after June 27, 2025, Defendant retaliated against Plaintiff by presenting false information to the Missouri Division of Employment Security, causing Plaintiff's unemployment claim to be denied.

328.  Defendant's retaliatory acts against Plaintiff were motivated by her protected oppositional activity.

329.  The agents, servants, and employees of Defendant, identified herein, were at all such times acting within the scope and course of their agency and employment; and/or their actions were expressly authorized by Defendant; and/or their actions were ratified by Defendant, thus making Defendant liable.

330.  Defendant's conduct was outrageous because of its evil motive or reckless indifference to the rights of Plaintiff, and/or intentionally harmed Plaintiff without just cause, thereby making Defendant liable for punitive damages in an amount that will punish Defendant and deter Defendant and others from like conduct.

331.  As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered economic harms, including but not limited to lost wages and other employment benefits.

43

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

332. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered non-economic harms, including but not limited to garden variety emotional distress, loss of dignity, fear, anxiety, dread, humiliation, inconvenience, mental anguish, embarrassment, and deprivation of her civil rights.

333. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered non-economic harms, including but not limited to emotional distress of sufficient severity to be medically significant.

334. While being retaliated against, Plaintiff developed MDD due to the stress of the ongoing retaliation.

335. Plaintiff's MDD was sufficiently severe to require medical treatment.

336. In addition, Plaintiff has incurred and will continue to incur attorneys' fees, costs, and expenses of suit.

337. Plaintiff is entitled to recover reasonable attorneys' fees and costs from Defendant, as provided in § 213.111.2, RSMo.

WHEREFORE, Plaintiff requests that this Court, after trial by jury, enter judgment against Defendant and in her favor on Count IV of this Petition and for a finding that she has been subjected to unlawful retaliation prohibited by § 213.070, RSMo; for actual, compensatory, and/or punitive damages in such an amount in excess of $25,000.00 as is deemed fair and reasonable; for prejudgment interest, as allowed by law; for reasonable attorneys' fees, costs and expenses of litigation; for injunctive relief or other appropriate equitable relief; and for such other relief as this Court deems just and proper.

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

## COUNT V

## Americans with Disabilities Act

### *Failure to Accommodate - 42 U.S. Code § 12112(b)(5)*

338. Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

339. Plaintiff is a qualified individual with a disability.

340. Plaintiff requested reasonable workplace accommodations.

341. Defendant failed or refused to engage Plaintiff in an interactive process.

342. Defendant failed to accommodate Plaintiff.

343. The agents, servants, and employees of Defendant, identified herein, were at all such times acting within the scope and course of their agency and employment; and/or their actions were expressly authorized by Defendant; and/or their actions were ratified by Defendant, thus making Defendant liable.

344. Defendant's conduct was outrageous because of its evil motive or reckless indifference to the rights of Plaintiff, and/or intentionally harmed Plaintiff without just cause, thereby making Defendant liable for punitive damages in an amount that will punish Defendant and deter Defendant and others from like conduct.

345. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered economic harms, including but not limited to lost wages and other employment benefits.

346. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered non-economic harms, including but not limited to garden variety emotional

45

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

distress, loss of dignity, fear, anxiety, dread, humiliation, inconvenience, mental anguish, embarrassment, and deprivation of her civil rights.

347. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered non-economic harms, including but not limited to emotional distress of sufficient severity to be medically significant.

348. While being discriminated against, Plaintiff developed MDD due to the stress of the ongoing failure to accommodate.

349. Plaintiff's MDD was sufficiently severe to require medical treatment.

350. In addition, Plaintiff has incurred and will continue to incur attorneys' fees, costs, and expenses of suit.

351. Plaintiff is entitled to recover reasonable attorneys' fees and costs from Defendant, as provided in 42 U.S. Code § 12205.

WHEREFORE, Plaintiff requests that this Court, after trial by jury, enter judgment against Defendant and in her favor on Count V of this Petition and for a finding that she has been subjected to unlawful discrimination prohibited by 42 U.S. Code § 12112(b)(5); for actual, compensatory, and/or punitive damages in such an amount in excess of $25,000.00 as is deemed fair and reasonable; for prejudgment interest, as allowed by law; for reasonable attorneys' fees, costs and expenses of litigation; for injunctive relief or other appropriate equitable relief; and for such other relief as this Court deems just and proper.

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

## COUNT VI

### Americans with Disabilities Act

*Disability Discrimination - 42 U.S. Code § 12112(b)(1)-(2)*

352. Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

353. Defendant's actions unlawfully limited, segregated, and classified Plaintiff based on her disability.

354. Defendant participated in a contractual relationship with an organization providing fringe benefits to Defendant's employees, which had the effect of subjecting Plaintiff to prohibited disability discrimination.

355. The agents, servants, and employees of Defendant, identified herein, were at all such times acting within the scope and course of their agency and employment; and/or their actions were expressly authorized by Defendant; and/or their actions were ratified by Defendant, thus making Defendant liable.

356. Defendant's conduct was outrageous because of its evil motive or reckless indifference to the rights of Plaintiff, and/or intentionally harmed Plaintiff without just cause, thereby making Defendant liable for punitive damages in an amount that will punish Defendant and deter Defendant and others from like conduct.

357. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered economic harms, including but not limited to lost wages and other employment benefits.

47

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

358. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered non-economic harms, including but not limited to garden variety emotional distress, loss of dignity, fear, anxiety, dread, humiliation, inconvenience, mental anguish, embarrassment, and deprivation of her civil rights.

359. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered non-economic harms, including but not limited to emotional distress of sufficient severity to be medically significant.

360. While being discriminated against, Plaintiff developed MDD due to the stress of the ongoing failure to accommodate.

361. Plaintiff's MDD was sufficiently severe to require medical treatment.

362. In addition, Plaintiff has incurred and will continue to incur attorneys' fees, costs, and expenses of suit.

363. Plaintiff is entitled to recover reasonable attorneys' fees and costs from Defendant, as provided in 42 U.S. Code § 12205.

WHEREFORE, Plaintiff requests that this Court, after trial by jury, enter judgment against Defendant and in her favor on Count VI of this Petition and for a finding that she has been subjected to unlawful discrimination prohibited by 42 U.S. Code § 12112(b)(1)-(2); for actual, compensatory, and/or punitive damages in such an amount in excess of $25,000.00 as is deemed fair and reasonable; for prejudgment interest, as allowed by law; for reasonable attorneys' fees, costs and expenses of litigation; for injunctive relief or other appropriate equitable relief; and for such other relief as this Court deems just and proper.

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

## COUNT VII

## Americans with Disabilities Act

*Hostile Work Environment - 42 U.S. Code § 12112(a)*

364. Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

365. Defendant's harassment against Plaintiff was motivated by Plaintiff's ADHD, ASD, MDD, GAD, and/or C-PTSD.

366. Defendant's harassment toward Plaintiff was unwelcome.

367. The harassment created an objectively hostile or abusive work environment that a reasonable person would find hostile or abusive.

368. The harassment created a work environment that Plaintiff perceived to be hostile and abusive.

369. The harassment was sufficiently severe and/or pervasive to affect a term, condition, or privilege of Plaintiff's employment.

370. Defendant possessed both actual and constructive knowledge of the hostile work environment to which Plaintiff was subjected.

371. Despite having both actual and constructive knowledge, Defendant failed to take appropriate and effective steps reasonably calculated to stop or mitigate the harassment that created the hostile work environment.

372. The agents, servants, and employees of Defendant, identified herein, were at all such times acting within the scope and course of their agency and employment; and/or

49

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

their actions were expressly authorized by Defendant; and/or their actions were ratified by Defendant, thus making Defendant liable.

373. Defendant's conduct was outrageous because of its evil motive or reckless indifference to the rights of Plaintiff, and/or intentionally harmed Plaintiff without just cause, thereby making Defendant liable for punitive damages in an amount that will punish Defendant and deter Defendant and others from like conduct.

374. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered economic harms, including but not limited to lost wages and other employment benefits.

375. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered non-economic harms, including but not limited to garden variety emotional distress, loss of dignity, fear, anxiety, dread, humiliation, inconvenience, mental anguish, embarrassment, and deprivation of her civil rights.

376. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered non-economic harms, including but not limited to emotional distress of sufficient severity to be medically significant.

377. While being subjected to a hostile work environment, Plaintiff developed MDD due to the stress of the ongoing harassment.

378. Plaintiff's MDD was sufficiently severe to require medical treatment.

379. In addition, Plaintiff has incurred and will continue to incur attorneys' fees, costs, and expenses of suit.

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

380. Plaintiff is entitled to recover reasonable attorneys' fees and costs from Defendant, as provided in 42 U.S. Code § 12205.

WHEREFORE, Plaintiff requests that this Court, after trial by jury, enter judgment against Defendant and in her favor on Count VII of this Petition and for a finding that she has been subjected to unlawful discrimination prohibited by 42 U.S. Code § 12112(a); for actual, compensatory, and/or punitive damages in such an amount in excess of $25,000.00 as is deemed fair and reasonable; for prejudgment interest, as allowed by law; for reasonable attorneys' fees, costs and expenses of litigation; for injunctive relief or other appropriate equitable relief; and for such other relief as this Court deems just and proper.

## COUNT VIII

### Americans with Disabilities Act

*Retaliation, Interference, Coercion, or Intimidation - 42 U.S. Code § 12203*

381. Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

382. Plaintiff engaged in protected activity when she made requests for reasonable accommodations on or about November 2024 and February 3, 2025.

383. Defendant took retaliatory, interfering, coercive, and intimidating action against Plaintiff.

384. Defendants were motivated by Plaintiff's exercise or enjoyment of her rights under the ADA.

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

385. The agents, servants, and employees of Defendant, identified herein, were at all such times acting within the scope and course of their agency and employment; and/or their actions were expressly authorized by Defendant; and/or their actions were ratified by Defendant, thus making Defendant liable.

386. Defendant's conduct was outrageous because of its evil motive or reckless indifference to the rights of Plaintiff, and/or intentionally harmed Plaintiff without just cause, thereby making Defendant liable for punitive damages in an amount that will punish Defendant and deter Defendant and others from like conduct.

387. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered economic harms, including but not limited to lost wages and other employment benefits.

388. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered non-economic harms, including but not limited to garden variety emotional distress, loss of dignity, fear, anxiety, dread, humiliation, inconvenience, mental anguish, embarrassment, and deprivation of her civil rights.

389. As a direct and proximate result of Defendant's actions and inactions, Plaintiff has suffered non-economic harms, including but not limited to emotional distress of sufficient severity to be medically significant.

390. While being retaliated against, Plaintiff developed MDD due to the stress of the ongoing retaliation.

391. Plaintiff's MDD was sufficiently severe to require medical treatment.

52

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

392. In addition, Plaintiff has incurred and will continue to incur attorneys' fees, costs, and expenses of suit.

393. Plaintiff is entitled to recover reasonable attorneys' fees and costs from Defendant, as provided in 42 U.S. Code § 12205.

WHEREFORE, Plaintiff requests that this Court, after trial by jury, enter judgment against Defendant and in her favor on Count VIII of this Petition and for a finding that she has been subjected to unlawful retaliation prohibited by 42 U.S. Code § 12203; for actual, compensatory, and/or punitive damages in such an amount in excess of $25,000.00 as is deemed fair and reasonable; for prejudgment interest, as allowed by law; for reasonable attorneys' fees, costs and expenses of litigation; for injunctive relief or other appropriate equitable relief; and for such other relief as this Court deems just and proper.

## COUNT IX

### Family & Medical Leave Act

*Interference - 29 U.S.Code § 2615(a)(1)*

394. Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

395. At all relevant times, Defendant employed 50 or more employees within 75 miles of Plaintiff's worksite and was a covered "employer" within the meaning of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 et seq.

396. At all relevant times, Plaintiff was an "eligible employee" within the meaning of the FMLA because she had been employed by Defendant for at least 12 months and had

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

worked at least 1,250 hours during the 12-month period immediately preceding the commencement of her leave.

397.    Defendant violated the FMLA by unlawfully interfering with, restraining, and/or denying the exercises of Plaintiff's FMLA rights.

398.    Specifically, Defendant immediately denied her Short-Term Disability (STD) benefits—which run in conjunction with FMLA leave—despite receiving comprehensive certification from Plaintiff's healthcare providers.

399.    The denial of STD benefits was designed to cause severe financial strain during Plaintiff's unpaid FMLA leave, effectively punishing her for exercising her federally protected rights and ultimately forcing her constructive discharge on May 22, 2025.

400.    As a direct and proximate result of Defendant's unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief, including but not limited to recovery of her attorneys' fees, costs, in addition to interest at the prevailing interest rate.

401.    Defendant's unlawful action constitutes bad faith, malicious, willful, and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

WHEREFORE, Plaintiff requests that this Court, after trial by jury, enter judgment against Defendant and in her favor on Count IX of this Petition and for a finding that she has been subjected to unlawful interference prohibited by 29 U.S.Code § 2615(a)(1); for actual, compensatory, and/or liquidated damages as is deemed fair and reasonable; for

54

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

prejudgment interest, as allowed by law; for reasonable attorneys' fees, costs and expenses of litigation; for injunctive relief or other appropriate equitable relief; and for such other relief as this Court deems just and proper.

## COUNT X

### Family & Medical Leave Act

*Retaliation - 29 U.S.Code § 2615(a)(2)*

402. Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

403. Defendant violated the FMLA by unlawfully retaliating against Plaintiff for exercising her FMLA rights by:

   a. refusing to make reasonable accommodations to enable Plaintiff to return to her position;

   b. failing to remedy the hostile work environment so that Plaintiff could return to her position;

   c. failing to remedy the discrimination so that Plaintiff could return to her position;

   d. failing to remedy the retaliation so that Plaintiff could return to her position; and

   e. Constructively terminating Plaintiff's employment.

404. As a direct and proximate result of Defendant's unlawful conduct in violation of the FMLA, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief, including but not limited to recovery of her attorneys' fees, costs, in addition to interest at the prevailing interest rate.

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

405. Defendant's unlawful action constitutes bad faith, malicious, willful, and wanton violations of the FMLA for which Plaintiff is entitled to an award of liquidated damages.

WHEREFORE, Plaintiff requests that this Court, after trial by jury, enter judgment against Defendant and in her favor on Count X of this Petition and for a finding that she has been subjected to unlawful retaliation prohibited by 29 U.S.Code § 2615(a)(2); for actual, compensatory, and/or liquidated damages as is deemed fair and reasonable; for prejudgment interest, as allowed by law; for reasonable attorneys' fees, costs and expenses of litigation; for injunctive relief or other appropriate equitable relief; and for such other relief as this Court deems just and proper.

## COUNT XI

### Breach of Contract

*Good Faith and Fair Dealing*

406. Plaintiff hereby incorporates by reference all paragraphs of this Complaint as if fully set forth herein.

407. On or about September 1, 2023. Plaintiff and Defendant entered into an employment contract.

408. At all relevant times, Plaintiff has fully performed all obligations required under the employment contract.

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

409. Defendant breached the implied covenant of good faith and fair dealing with respect to the employment contract by unlawfully discriminating and retaliating against Plaintiff.

410. Defendant's conduct was intended to force Plaintiff to quit, thereby relieving Defendant of its obligation to pay Plaintiff a severance benefit.

411. Defendant breached the implied covenant of good faith and fair dealing with respect to the employment contract by causing Plaintiff's constructive discharge.

412. Defendant's conduct was intended to frustrate Plaintiff's legitimate expectations under the employment contract to receive her severance benefit

413. Defendant breached the implied covenant of good faith and fair dealing with respect to the employment contract by withholding Plaintiff's severance benefits, demanding she first submit to a separation agreement that imposed additional, contradictory, and unconscionable post-employment restrictions far exceeding the employment contract's preconditions to receiving the severance benefit.

414. Defendant's conduct was intended to silence and coerce Plaintiff into waiving her legal claims against Defendant.

415. Defendant's conduct was unjustified, and unfair.

416. As a direct and proximate result of Defendant's violation and breach of the employment contract, Plaintiff has been harmed and damaged.

417. Plaintiff is entitled to damages equal to the severance benefit described in the employment contract.

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

418.   Plaintiff is entitled to an award of pre-judgment and post-judgment interest at the applicable legal rate.

419.   Defendant's conduct was outrageous because of its evil motive or reckless indifference to the rights of Plaintiff and/or reckless indifference to the consequences, thereby entitling her to an award of punitive damages in an amount that will punish Defendant and deter Defendant and others from like conduct.

WHEREFORE, Plaintiff requests that this Court, after trial by jury, enter judgment against Defendant and in her favor on Count XI of this Petition and award Plaintiff actual, compensatory, and/or punitive damages as is deemed fair and reasonable; for prejudgment interest, as allowed by law; for reasonable attorneys' fees, costs and expenses of litigation; for injunctive relief or other appropriate equitable relief; and for such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury on all issues in this case which are so triable.

Respectfully submitted,

/s/ L.E. Beck
L.E. Beck, #74043
Katherine Grant, # 75044
Beck & Grant LLC
4571 Laclede Ave.
Suite 284
Saint Louis, MO 63108
Phone:          (314) 246-0336
Email:          l.e.beck@beckgrantlaw.com
                k.grant@beckgrantlaw.com

ATTORNEYS FOR PLAINTIFF

58

**26SL-CC04056**

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☒ FEPA ☐ EEOC | |

**PLAINTIFF'S EXHIBIT 1**

### Missouri Commission on Human Rights and EEOC

_State or local Agency, if any_

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Breann Heininger | 618-207-5277 | REDACTED 1985 |

| Street Address | City, State and ZIP Code |
|---|---|
| 3925 White Rose Ln. | St. Charles MO 63304 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| ELCO Administrative Services Company | 500+ | |

| Street Address | City, State and ZIP Code |
|---|---|
| 600 Corporate Park Dr. St. Louis, MO 63105-4204 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

**DISCRIMINATION BASED ON** *(Check appropriate box(es).)*

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☒ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

**DATE(S) DISCRIMINATION TOOK PLACE**

Earliest: Spring 2024    Latest: 06/15/2025

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

See attached narrative.

**Filed with MCHR 06/23/2025**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| 6/14/2025   Date   Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

Katherine Grant

KATHERINE GRANT
Notary Public, Notary Seal
State of Missouri
St. Louis City
Commission # 22145628
My Commission Expires 11-08-2026

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

My name is Breann Heininger. I am filing this charge of discrimination because I feel that my employer discriminated against me because I have a disability, and that I was retaliated against for raising my concerns.

I have worked for Enterprise, the rental car company, since 2008. I started as a Management Trainee and was promoted several times throughout my career. After reaching the role of Assistant Branch Manager, I transitioned to our Risk Management department, specifically a division called ELCO Claims Administrative Services DBA Rental Claims Services, in 2012 where I began as a claims adjuster. I was quickly promoted to Liability Supervisor supervising a team of seven subordinate employees while in that role. I was successful in this role and frequently received praise for my ability to work with my team.

Next, I was promoted to Talent Development Manager from 2018 to 2023. In this role, I was responsible for training insurance adjusters on how to perform their various responsibilities, a process that required significant interpersonal skills and excellent verbal and written communication. On my performance reviews I was overwhelmingly rated as "Exceeds Requirements," "Advanced," or "Expert" across multiple categories, and my strengths in building relationships with others were recognized and identified each year.

I was promoted in August of 2023 to Director of the Special Investigations Unit ("SIU"). At that time, my direct manager was Assistant Vice President David Tashiro, whom I also reported to during most of my time as a Talent Development Manager.

The SIU is the team responsible for detecting and investigating insurance fraud related to the company's fleet of vehicles. My educational background, work experience, and professional credentials made me a highly qualified candidate for the role. As SIU Director, I worked a hybrid schedule to manage a team of seven remote employees across seven different states. I also had responsibilities that required me to network with professionals from other auto service companies, such as U-Haul, and I handled strategic planning within my department and had many responsibilities that required me to exercise my professional judgment.

When I took the Director position in 2023, there had been no serious concerns expressed to me regarding my communication skills. If David had any significant concerns about my ability to interact with my coworkers, subordinates, leadership, or external professionals, he never expressed them to me and praised me for my abilities in those areas in multiple prior performance reviews. In early January 2024, Jody Reynolds was promoted to a Vice President position, so David then reported directly to Jody. Up until then, I always had a great relationship with both David and Jody. Jody and I had worked together during some training development programs in the past and she cofacilitated some classes with me.

At first, I believed that Jody and I would have a good working relationship; however, around the spring of 2024, David began to criticize my communication style, seemingly at Jody's direction but would not explain what she felt the problem was, or specifically what he wanted me to change. I sought feedback from my peers and mentorships from more senior employees about effective communication. Although their feedback was mostly positive, they made some good suggestions that I worked to implement.

**Filed with MCHR 06/23/2025**     1

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

Despite my efforts to change my communication style to both David and Jody's preference, David became increasingly critical and aggressive with his criticism. Whenever I exercised my professional judgment, he would discredit my efforts or disparage the results that I achieved. When I would ask clarifying questions about his instructions or a procedure, he would respond in an exasperated tone or change the subject. I believe he frequently misconstrued my questions on purpose, so he'd have an excuse to criticize me. I also think he tried to malign my professional skills during his interactions with Jody, which caused tension in my working relationship with her.

David's constant hostility toward me impacted my mental health, so I sought treatment with a therapist starting on November 8, 2024. She immediately identified ADHD, CPTSD, Generalized Anxiety Disorder (GAD), and suspected Autism Spectrum Disorder (ASD). She forwarded her findings to my psychiatrist who confirmed the diagnoses on November 22, 2024. Some features of ASD and/or ADHD include being talkative and having atypical conversation patterns and nonverbal communication styles, so I began to wonder whether the "problems" David seemed to find with my communication were actually symptoms of ASD and/or ADHD.

I disclosed these diagnoses to David shortly after receiving them and mentioned that I was still undergoing testing and evaluation for possible ASD with my psychiatrist. I wanted to share this information with David because I hoped that, if he understood I was dealing with an anxiety disorder, ADHD, and was working with healthcare providers to explore whether ASD was impairing my ability to communicate the way he wanted, he would be more willing to collaborate with me in good faith to accommodate my communication style. When I told him about my diagnosis, he didn't say much. Instead, I received a call from Julie Kraus, my HR Manager, later the same day after he informed them that I had disclosed medical conditions. Julie told me not to discuss my disabilities with David or anyone outside of HR. I felt like I was being told to keep my disabilities a secret at work. ASD was later diagnosed by my psychiatrist.

During my conversation with Julie in November 2024, I tried to explain that I didn't feel like I needed any disability accommodations to perform my job, but that an accommodation for how I seek out and receive feedback or critiques would be helpful. I explained how David's hostility was distressing and felt unfair and targeted, especially considering he couldn't explain what he'd like me to change. I felt like he stopped listening to *what* I had to say and was more focused on finding a problem with *how* I said it. This disconnect caused multiple miscommunications through the end of 2024 and into 2025, giving David more opportunities to be unfairly critical of me.

After disclosing my disabilities to David, I feel like he began to tailor his hostile behaviors to make it seem as if my disabilities prevented me from doing my job or to aggravate my symptoms. For example, in December 2024, David and I attended an annual meeting together, and after the meeting, he chastised me for asking a question during a group discussion. He complained that I should have remained silent and just listened to the people with more experience, and that I was wrong to presume to ask a question, even though other people at the meeting thanked me for asking and stated that it was a good question.

**Filed with MCHR 06/23/2025**

2

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

Then, during a Teams virtual call on or about December 19, 2024, David yelled at me so loudly and for so long that a coworker who heard him from a different office contacted me afterwards to see if I was okay. I was not okay, as David's yelling had caused me significant anxiety, and I felt as if I wasn't able to defend myself or explain how being yelled at impacts me, because HR had told me I wasn't allowed to talk about my disabilities with him anymore.

There were many other occasions on which I felt David was treating me poorly because of my disabilities or intentionally acting in a way to aggravate my symptoms, but some of the most significant happened in early Spring of 2025.

On or about February 3, 2025, I was having a follow-up discussion with David after a team meeting, and I asked his opinion on the team's auditing process. After he shared his opinion, I began to agree with him, but he put his hand up to signal me to stop speaking, and insisted that I didn't understand what he was talking about. He re-explained the same thing several times, refused to allow me to speak to assure him that I understood his opinion, as if he thought I was too dumb to understand him. Despite how rude he had been during this discussion, I wanted things to improve so I sent him a message after this interaction to ask that he make some changes to how we communicate with each other. For example, I proposed that it would be helpful for me to receive feedback in a written format instead of verbally, possibly as an accommodation for ADHD. I also suggested that it would be helpful for me if his feedback was direct and specific to my job performance instead of using a lot of analogies and anecdotes, which leave me to guess at what he means, possibly as an accommodation for ASD.

On or about February 6, 2025, David and I flew home from a professional conference in Florida. While traveling, David told me I was being kept out of meetings, which I believe were relevant to my job, because of how I communicate. He stated, "You are just a dreamer, and you are not allowed to have a seat at the table because of your communication." When I asked him for an example of my communication being a problem, he couldn't give me one, just that he thought I talked too much. We were separated briefly while waiting to board at the airport. At that time, I sent him a text explaining that I would continue working on how much I discuss, but that I felt like I was being micromanaged, excluded, shamed, and humiliated for just being myself. I reiterated that my goal was to work with him to create an environment where I have the space to perform my job. After rejoining on the airplane, David read my text message and told me that I was "making everything about DE&I." I took this to mean that David was resentful that I had asked for disability accommodations related to communication at work.

He then changed the subject and stated that I was neglecting my team and that I should be spending more time with them. This critique surprised me because I spend a lot of time working with the individuals on my team, and I have always gotten good feedback from my team members, as well as after a recent HR visit. I began to feel he was creating a narrative about me that was very different from reality.

On February 7, 2025, I sent an email to HR Representative Julie Krause reporting that I had been subjected to unfair treatment by David. I explained how what was expected of me was unclear, I was being given inconsistent directions, and that the feedback I was getting about communication seemed to be based entirely on David or Jody's preference and not on what my

**Filed with MCHR 06/23/2025**                    3

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

job actually required. I also explained that the work environment had begun to feel threatening, and that I would be punished for even minor mistakes. I concluded, "I am worried that disclosing these experiences will be taken out of context and that doing so will put me in a worse situation. Even writing this email to you makes me sick to my stomach. But this isn't about just me, and I want to help create a safe place for those who come after me, which is why I have decided to come forward with my concerns."

I met with Julie on or about February 10, 2025, to discuss my concerns. At that meeting, I told Julie about the unfair treatment and David's refusal to make any accommodations regarding communication styles and hostile treatment. She responded that this seemed like "a performance issue" and that it didn't warrant any investigation, but said she would discuss it with David and inform senior leadership about my complaint. A few days later Julie acknowledged that there was a communication problem, and said that we could work through it so I could focus on the bigger picture for my department. I believe that this meant the company was going to work with me to find accommodations for communication at work so I could do my job.

After Julie had her conversation with David, his harassment lessened for a couple of weeks, but then his already hostile treatment toward me became even more severe.

For example, on or about March 3-5, 2025, David and I traveled to another conference together. During the trip, I gave David a progress update on a project Jody had assigned me. When he went to show me an email from Jody related to the project on his phone, he accidentally went to a screen showing that he had a timer running, and he told me that he had been secretly timing me during the progress update "to see how long it took me to get to the point." I thought this was discriminatory, but I tried to refocus our discussion back on the project for Jody. He repeatedly interrupted me and raised his voice drawing notice of others in the airline terminal. His behavior led me to believe that he was angry about the complaint that I made to HR. I was uncomfortable with the spectacle he was causing and asked that we resume the conversation later.

Later, when we returned to the office after the conference, David revealed to me that he had also secretly made an audio recording of me asking a question during one of the breakout sessions at the conference, and that he planned to share the recording with Jody. While the recording he shared was positive, I grew concerned that he had recorded me other times so he could report back to Jody, and I wasn't sure if she had asked him to do this. I felt like I was under surveillance, and like the company was looking for a reason to fire me.

We ended up having a brief conversation about it via text. I explained to David that I found it unfair that he was timing our discussions but would interrupt me or talk over me while timing, which disrupted my train of thought and made me have to start over again, making the conversation take longer than it needed to. I reiterated all the efforts I have made to make improvements for the team and again asked that he hold me to fair expectations and treat me with respect. His response to me was just to say, "My goodness, you've been writing and thinking!", and that we could "unpack" my concerns later and wish me safe travels. We did not "unpack" my concerns later.

**Filed with MCHR 06/23/2025**

4

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

On or about March 27, 2025, David gave me my first negative performance review. Categories that I had previously been rated as "Exceeds Requirements," "Advanced," or "Expert" were now rated as merely "Basic." David told me that he would rate me even lower on those categories if I didn't "fix" the problems he identified. I believed I was given a negative performance review so the company could fire me for having a disability, or reporting discrimination, and then claim they actually fired me for poor performance.

On April 28th, 2024, I checked in with HR about their investigation into my reports of unfair treatment and lack of accommodations for communication. David and I had recently had several more negative interactions, and he had become increasingly distant and almost refused to provide me with meaningful feedback or assistance. Again, this felt like a direct result of my complaint to HR. HR Manager Julie Kraus told me that David and Jody would likely not change, and that if I couldn't be happy working under these conditions, I needed to decide whether I wanted to continue working for the company.

This conversation made it clear to me that I was not going to be granted disability accommodations, David was not going to be held accountable for harassing me on the basis of my disability, and that the company was trying to push me out. I thought I was doing the right thing by disclosing this information to the company so that we could work together and enable me to perform my job functions in a fair and respectful environment. Instead, I feel that I have been discriminated against and endured multiple retaliatory actions because I stood up for myself. It was very distressing to watch my 17-year career with Enterprise unravel all because I was diagnosed with a disability. Being subjected to continuous discrimination and retaliation took a heavy toll on my mental health. I started exhibiting symptoms of Major Depressive Disorder in early 2025. This was also noticed by friends and colleagues.

On or about April 29, 2025, David and I had to go on a one-day trip to Chicago to visit with the NICB. He barely spoke a word to me during the entirety of the trip, and he kept a literal tally of any time I spoke during the trip. On the car ride back to the airport, I tried to talk to him and see what his main takeaways were from the NICB presentations, and he kept changing the subject. It felt like he was scared to say anything to me and it was clear that he was aware of my discussion with HR. On or about April 30, 2025 I told Julie from HR about how David was now refusing to speak to me and keeping a tally of how often I spoke. I also told her how the discriminatory treatment was taking a toll on my mental and physical health. She just responded that she knew David wanted our working relationship to improve.

In consultation with my mental health care providers, it was determined that I needed to take medical leave from work to attend to my health. I notified HR of this on May 4, 2025 and my leave began the following day. I submitted the necessary documentation to take job-protected FMLA leave, which the company approved. I also followed the company's procedure to apply for Short Term Disability so I wouldn't go without pay after using up my PTO. However, on May 13, 2025, the company denied my Short-Term Disability request without explaining why, just that I "didn't meet the criteria."

**Filed with MCHR 06/23/2025**

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

I appealed the denial on May 15, 2025. I asked for factual clarification on why my application was denied and raised my concerns that the same HR employees who failed to investigate and respond to my reports of discrimination and retaliation had been the ones to deny my application for Short Term Disability. The company responded on May 19, 2025, affirming their denial. I believe that I did indeed meet the criteria for Short Term Disability benefits, and that Enterprise denied my application in retaliation for reporting disability discrimination and retaliation.

At this point, I felt that the ongoing discriminatory and retaliatory actions against me were intolerable, and that the company was not going to do anything about it, so I contacted HR from my personal email to ask about how to go about separating my employment. I was concerned about how the separation would be classified, because my employment agreement specified that I would not be eligible for severance pay if I voluntarily left the company, but I didn't feel that I was voluntarily leaving, I felt as if I was being pushed out.

HR responded immediately that they would be willing to offer me severance pay if I agreed to release all claims I might have against them for disability discrimination and retaliation, amongst others, and also agree to an incredibly overbroad non-compete clause that would render me unable to work in any field related to insurance within a 150 mile radius of my home or within 150 miles of any Enterprise location that any remote employee I ever supervised was based out of, for a period of two years.

I tried to negotiate a reasonable non-compete clause that protected the company's proprietary information but allowed me to continue my career in the insurance industry, without moving me and my family hundreds of miles away from our home. However the company refused to deviate from their standard non-compete clause, and HR would not confirm whether the company intended to sue me if I took a job that merely utilized my general experience gained during my career with Enterprise. Instead, Julie Kraus suggested that I submit all potential future employers to the company in writing and that my requests would be reviewed by senior leadership to determine if the company would approve them or if accepting employment would allow them to sue me. The terms that the company is insisting upon are so unreasonable that I believe that this is further discrimination or retaliation against me, especially considering the non-compete clause states that Enterprise has "sole discretion" to decide whether any particular job opportunity would be in violation of the overbroad non-compete clause.

The discriminatory and retaliatory actions by Enterprise have caused me to suffer damages, including lost wages and benefits, pain and suffering, emotional distress, embarrassment, humiliation, and harm to my personal and professional reputation. As a remedy, I am seeking an end to the discrimination, prejudice, and retaliation that Enterprise and its employees have subjected me to; that Enterprise cease and desist such unlawful and discriminatory acts; that steps are taken to protect me and other employees like me from the type of conduct described above; and from all other forms of discrimination and retaliation in the future. I also seek compensation for my pain, suffering, humiliation, embarrassment, emotional distress, the harm to my personal and professional reputation, and anything else the Commission deems just and proper.

**Filed with MCHR 06/23/2025**

6

**26SL-CC04056**

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

EEOC Form 5 (11/09)

| AMENDED<br>CHARGE OF DISCRIMINATION<br><br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To:<br><br>FEPA<br><br>EEOC | Agency(ies) Charge No(s):<br><br>E-06/25-57102<br><br>28E-2025-00704 |
|---|---|---|

### Missouri Commission on Human Rights and EEOC
*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)*<br>Breann Heininger | Home Phone *(Incl. Area Code)*<br>618-207-5277 | Date of Birth<br>REDACT /1985 |
|---|---|---|

| Street Address<br>3925 White Rose Lane | City, State and ZIP Code<br>St. Charles, MO 63304 |
|---|---|

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name<br>ELCO Administrative Services Company | No. Employees, Members<br>50+ | Phone No. *(Include Area Code)*<br>1-800-321-3526 |
|---|---|---|

| Street Address<br>600 Corporate Park Drive | City, State and ZIP Code<br>St. Louis, MO 63105 |
|---|---|

| DISCRIMINATION BASED ON *(Check appropriate box(es).)*<br><br>Disability<br>Retaliation | DATE(S) DISCRIMINATION TOOK PLACE<br>Earliest            Latest<br>Spring 2024 - Present<br><br>CONTINUING ACTION: Yes |
|---|---|

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

See attached narrative.

**MCHR FILED 11/19/2025**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| 2025-11-19                    *Breann Fowlkes Heininger*<br><br>_____        _____<br>Date                    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br><br>*(month, day, year)* |

PLAINTIFF'S EXHIBIT

2
_____

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

## Background

My name is Breann Heininger. I am filing this charge of discrimination because I feel that my employer discriminated against me because I have a disability, and that I was retaliated against for raising my concerns, asserting my rights, and filing a charge of discrimination with the MCHR and EEOC.

I began working for Enterprise, the rental car company, in 2008 as a Management Trainee, and was promoted several times throughout my career. After reaching the role of Assistant Branch Manager, I transitioned to the Risk Management department, specifically a division called ELCO Claims Administrative Services d/b/a Rental Claims Services, in 2012 where I began as a claims adjuster. I was quickly promoted to Liability Supervisor supervising a team of seven subordinate employees while in that role. I was successful in this role and frequently received praise for my ability to work with my team.

Next, I was promoted to Talent Development Manager from 2018 to 2023. In this role, I was responsible for training insurance adjusters on how to perform their various responsibilities, a process that required significant interpersonal skills and excellent verbal and written communication. On my performance reviews I was overwhelmingly rated as "Exceeds Requirements," "Advanced," or "Expert" across multiple categories, and my strengths in building relationships with others were recognized and identified each year.

I was promoted in August of 2023 to Director of the Special Investigations Unit ("SIU"). At that time, my direct manager was Assistant Vice President David Tashiro, whom I also reported to during most of my time as a Talent Development Manager.

The SIU team is responsible for detecting and investigating insurance fraud related to the company's fleet of vehicles. My educational background, work experience, and professional credentials made me a highly qualified candidate for the role. As SIU Director, I worked a hybrid schedule to manage a team of seven remote employees across seven different states. I also had responsibilities that required me to network with professionals from other auto service companies, such as U-Haul, and I handled strategic planning within my department and had many responsibilities that required me to exercise my professional judgment.

When I took the Director position in 2023, there had been no serious concerns expressed to me regarding my communication skills. If David had any significant concerns about my ability to interact with my coworkers, subordinates, leadership, or external professionals, he never expressed them to me and praised me for my abilities in those areas in multiple prior performance reviews. In early January 2024, Jody Reynolds was promoted to a Vice President position, so David then reported directly to Jody. Up until then, I always had a great relationship with both David and Jody. Jody and I had worked together during some training development programs in the past and she co-facilitated some classes with me.

**MCHR FILED 11/19/2025**

1

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

## Disability Discrimination Begins

At first, I believed that Jody, David, and I would have a good working relationship; however, around the spring of 2024, David began to criticize my communication style, seemingly at Jody's direction but would not explain what she felt the problem was, or specifically what he wanted me to change. I sought feedback from my peers and mentorship from more senior employees about effective communication. Although their feedback was mostly positive, they made some good suggestions that I worked to implement.

Despite my efforts to change my communication style to both David and Jody's preference, David became increasingly critical and aggressive with his criticism, and would yell at me. Whenever I exercised my professional judgment, he would discredit my efforts or disparage the results that I achieved. When I would ask clarifying questions about his instructions or a procedure, he would respond in an exasperated tone or change the subject. He frequently misconstrued my questions so he'd have an excuse to criticize me, and disparaged my professional skills during his interactions with Jody, which caused tension in my working relationship with her.

David's constant hostility toward me impacted my mental health, so I sought treatment with a therapist starting in October of 2024. She immediately identified ADHD, CPTSD, Generalized Anxiety Disorder (GAD), and suspected Autism Spectrum Disorder (ASD). She forwarded her findings to my psychiatrist who confirmed these diagnoses on November 22, 2024. My therapist and psychiatrist explained that these disorders can have a substantial impact on major life activities such as communication, learning, concentrating, thinking, and interacting with others. For example, some facets of ADHD, GAD, and/or ASD include:

- Being more talkative than average
- Being easily distracted
- Having racing thoughts
- Experiencing hypervigilance
- Having difficulties processing and responding to complex social cues
- Having atypical conversation patterns and nonverbal communication styles, and
- Using literal language.

Once I learned that my disabilities impact the way I communicate and interact with others, I realized that the "problems" David had with my communication were actually just symptoms of my disabilities.

## Accommodation Requests Denied

I disclosed these diagnoses to David in November 2024. I hoped that if he understood that my disabilities impact the way I communicate, he would be willing to collaborate with me in good faith to accommodate my disabilities. David didn't really respond when I told him about my disabilities, but I then received a phone call from HR Manager Julie Kraus, who told me I was not allowed to discuss my disabilities with David or anyone else outside of HR. I felt like I was being told to keep my disabilities a secret at work. I tried to explain that I didn't feel like I needed

MCHR FILED 11/19/2025

2

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

any disability accommodations to perform my day-to-day job responsibilities, but that an accommodation for how I seek out and receive feedback or critiques would be helpful. I explained how being screamed at induces severe anxiety symptoms, and that David's hostility felt unfair and targeted, especially considering he couldn't explain what he'd like me to change. I felt like he stopped listening to *what* I had to say and was more focused on finding a problem with *how* I said it.

## Disability Harassment Begins

After disclosing my disabilities to David, he began to tailor his hostile behaviors to make it seem as if my disabilities prevented me from doing my job, or to aggravate my symptoms.

For example, in December 2024, David and I attended an annual meeting together, and after the meeting, he chastised me for asking a question during a group discussion. He complained that I should have remained silent and just listened to the people with more experience, and that I was wrong to presume to ask a question, even though other people at the meeting thanked me for asking and stated that it was a good question.

Then, during a video conference call on or about December 19, 2024, David yelled at me so loudly and for so long that a coworker who heard him from a different office contacted me afterwards to see if I was okay. I was not okay, as David's yelling had caused significant anxiety, and I felt as if I wasn't able to defend myself or explain how his screaming impacts me, because HR had told me I wasn't allowed to talk about my disabilities.

On more than one occasion David yelled at me until I became tearful, and then chastised me for "being emotional." I worked with my care providers to learn anxiety coping strategies to use while being yelled at to help me not become tearful. David then began chastising me for "looking depressed" instead. He also compared me to a former employee that suffered a mental health crisis at work and was fired. I asked him not to compare me to other people with disabilities, but he continued to do so. In mid-December 2024 David told me that the last person who asked him to communicate differently got fired. I felt like he was implying that he would fire me if I tried to stand up for myself about my need for accommodations and the ongoing disability harassment.

There were many other occasions on which I felt David treated me less favorably because of my disabilities, or intentionally acted to aggravate my symptoms, but some of the most significant happened in early Spring of 2025.

On or about February 3, 2025, I was having a follow-up discussion with David after a team meeting, and I asked his opinion on the team's auditing process. After he shared his opinion, I began to agree with him, but he put his hand up to signal me to stop speaking, and insisted that I didn't understand what he was talking about. He yelled and re-explained the same thing several times, and refused to allow me to speak to assure him that I understood his opinion.

**MCHR FILED 11/19/2025**

3

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

Despite how rude he had been during this discussion, I wanted things to improve so I sent him a message to ask that we make some changes to how we communicate with each other. For example, I proposed that it would be helpful for me to receive feedback in a written format instead of verbally, possibly as an accommodation for ADHD. I also suggested that it would be helpful for me if his feedback was direct and specific to my job performance instead of using a lot of analogies and anecdotes, which leave me to guess at what he means, possibly as an accommodation for ASD.

## Retaliation Begins

On or about February 6, 2025, David and I flew home from a professional conference in Florida. While traveling, David told me I was being kept out of job-related meetings, stating "you are just a dreamer, and you are not allowed to have a seat at the table because of your communication." When I asked him for an example of my communication being a problem, he couldn't give me one, just that he thought I talked too much. I felt very frustrated that my request for accommodations related to communication had all been ignored, but I was being punished for it.

While separated from David at the airport, I explained via text message that I would continue working on how much I discuss, but that I felt like I was being micromanaged, excluded, shamed, and humiliated for just being myself. I reiterated that my goal was to work with him to create an environment where I have the support to perform my job. Once on the airplane, David read my text message and told me that I was "making everything about DE&I." I took this to mean that David understood that I was trying to exercise my civil rights, and that he was not going to work together with me to find reasonable accommodations related to communication at work.

He then changed the subject and stated that I was neglecting my team and that I should be spending more time with them. This critique surprised me because I spend a lot of time working with the individuals on my team, and I have always gotten good feedback from my team members, as well as after a recent HR visit. I began to feel he was creating a false narrative about me as an excuse to fire me because of my accommodation requests or because of my disabilities.

## Report to HR

On February 7, 2025, I sent an email to HR Manager Julie Krause reporting that I was still being subjected to unfair treatment by David. I explained that what was expected of me was unclear, I was being given inconsistent directions, and the feedback I was getting about communication seemed to be based entirely on David or Jody's preference and not on what my job actually required. I also explained that the work environment had begun to feel threatening, and that I would be punished for even minor mistakes. I concluded, "I am worried that disclosing these experiences will be taken out of context and that doing so will put me in a worse situation. Even writing this email to you makes me sick to my stomach. But this isn't about just me, and I want to help create a safe place for those who come after me, which is why I have decided to come forward with my concerns."

**MCHR FILED 11/19/2025**

4

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

I met with Julie on or about February 10, 2025, to discuss my concerns. At that meeting, I told Julie about the unfair treatment and David's refusal to make any disability accommodations regarding communication styles and hostile treatment. She responded that this seemed like "a performance issue" and that it didn't warrant any investigation, but said she would discuss it with David and inform senior leadership about my complaint. A few days later Julie acknowledged that there was a communication problem, and said that she would investigate, and we could work through it so I could focus on the bigger picture for my department. I believed that this meant the company was going to work with me to find accommodations for communication at work so I could do my job, but nothing ever came of it.

After Julie had her conversation with David, his harassment lessened for a couple of weeks, but then his already hostile treatment toward me became even more severe.

## Further Discrimination, Harassment, and Retaliation

On or about March 3-5, 2025, David and I traveled to another conference. During the trip while I was giving David a progress update on a project, he went to show me a related email on his phone but accidentally went to a screen showing that he had a timer running. David told me that he had been secretly timing me during the progress update "to see how long it took me to get to the point." I thought this was discriminatory, but I tried to refocus our discussion back on the project. David repeatedly interrupted me and raised his voice drawing notice of others in the airline terminal. His behavior led me to believe that he was angry about the complaint that I made to HR. I was uncomfortable with the spectacle he was causing and asked that we resume the conversation later.

When we returned to the office after the conference, David revealed to me that he had secretly made an audio recording of me asking a question during one of the breakout sessions at the conference, and that he planned to share the recording with Jody. While the recording he shared was positive, I grew concerned that he had recorded me other times so he could report back to Jody, and I wasn't sure if she had asked him to do this. I felt like I was under surveillance, and like the company was looking for a reason to fire me.

We ended up having a brief conversation about it via text. I explained to David that I found it unfair that he was timing our discussions but would interrupt me or talk over me while timing, which disrupted my train of thought and made me have to start over again, making the conversation take longer than it needed to. I reiterated all the efforts I have made to make improvements for the team and again asked that he hold me to fair expectations and treat me with respect. His response to me was just to say, "My goodness, you've been writing and thinking!", and that we could "unpack" my concerns later and wish me safe travels. We did not "unpack" my concerns later.

On or about March 27, 2025, David gave me my first ever negative performance review. Categories that I had previously been rated as "Exceeds Requirements," "Advanced," or "Expert" were now rated as merely "Basic." David told me that he would rate me even lower on those categories if I didn't "fix" the problems he identified. I believed I was given a negative

MCHR FILED 11/19/2025

5

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

performance review so the company could fire me for having a disability, or reporting discrimination, and then claim they actually fired me for poor performance.

The nitpicking continued to escalate. For example, in April 2025, David issued an informal counseling to me because I wore a plain knit sweater on a day I was working from home and taking care of my sick child, instead of the professional clothing I wear to the office.

## Intolerable Working Conditions

Being subjected to continuous discrimination and retaliation took a heavy toll on my mental health, and as a result I was diagnosed with Major Depressive Disorder in early 2025.

On April 28, 2025, I checked in with HR about their investigation into my reports of unfair treatment and lack of accommodations for communication. David and I had recently had several more negative interactions, and he had become increasingly distant and almost refused to provide me with meaningful feedback or assistance. Again, this felt like a direct result of my complaint to HR. HR Manager Julie Kraus told me that David and Jody would likely not make any changes to accommodate my disabilities, and that if I couldn't be happy working under these conditions that I needed to decide whether I wanted to continue working for the company.

This conversation made it clear to me that the Enterprise was not going to consider or grant disability accommodations, David was not going to be held accountable for harassing me on the basis of my disability, and that the company was trying to push me out. I thought I was doing the right thing by disclosing this information to the company so that we could work together and enable me to perform my job functions in a fair and respectful environment. Instead, Enterprise discriminated and retaliated against me because I stood up for myself. It was very distressing to watch my 17-year career with Enterprise unraveling all because I was diagnosed with a disability.

On or about April 29, 2025, David and I had to go on a one-day trip to Chicago. He barely spoke a word to me during the entirety of the trip, and he kept a literal tally of any time I spoke. On the car ride back to the airport, I tried to talk to him about work but he kept changing the subject. It felt like he was scared to say anything to me and it was clear that he was aware of my discussion with HR. On or about April 30, 2025 I told Julie from HR about how David was refusing to speak to me and keeping a tally of how often I spoke. I also told her how the discriminatory treatment was taking a toll on my mental and physical health. She just responded that she knew David wanted our working relationship to improve.

In consultation with my mental health care providers, it was determined that the unfair treatment I was experiencing at work was having a serious negative impact on my mental health, and I needed to take medical leave for treatment. I notified HR of this on May 4, 2025 and my leave began the following day. I submitted the necessary documentation to take job-protected FMLA leave, which the company approved. I also followed the company's procedure to apply for Short Term Disability so I wouldn't go without pay after using up my PTO. However, on May 13, 2025, the company denied my Short-Term Disability request without explaining why, just stating that I "didn't meet the criteria." I believe that I did indeed meet the

MCHR FILED 11/19/2025

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

criteria for Short Term Disability benefits, and that Enterprise denied my application in retaliation for reporting disability discrimination, harassment, and retaliation.

I appealed the denial on May 15, 2025. I asked for factual clarification on why my application was denied and raised my concerns that the same HR employees who failed to investigate and respond to my reports of discrimination and retaliation had been the ones to deny my application for Short Term Disability. The company responded on May 19, 2025, affirming their denial without any further explanation.

## Constructive Discharge

Because the company wouldn't make disability accommodations and refused to address the ongoing harassment and retaliation, I was unable to return to work from FMLA leave, and was constructively discharged on or about May 22, 2025.

I contacted HR from my personal email to ask about how my employment separation would be classified, because my employment agreement specified that I would not be eligible for severance pay if I voluntarily left the company, but I was not voluntarily leaving, I was pushed out.

 HR responded immediately that I could still get severance pay, but only if I agreed to release all legal claims I have against them for disability discrimination and retaliation, and also agree to an incredibly overbroad non-compete clause that would render me unable to work in any field related to insurance within a 150 mile radius of my home or within 150 miles of any Enterprise location that any remote employee I ever supervised was based out of, for a period of two years.

I tried to negotiate a reasonable non-compete clause that protected the company's proprietary information but allowed me to continue my career in the insurance industry, without moving me and my family hundreds of miles away from our home. However the company refused to deviate from their standard non-compete clause, and HR would not confirm whether the company intended to sue me if I took a job that merely utilized my general experience gained during my career with Enterprise. Instead, HR Manager Julie Kraus suggested that I submit all potential future employers to the company in writing and that my requests would be reviewed by senior leadership to determine if the company would approve them or if accepting employment would allow them to sue me.

The terms that the company insisted on were so unreasonable that I believe that it was further discrimination or retaliation against me, especially considering the non-compete clause states that Enterprise has "sole discretion" to decide whether any particular job opportunity would be in violation of the overbroad non-compete clause. Because I couldn't agree to these unreasonable terms, Enterprise refused to pay me severance.

I filed for unemployment on or about June 19, 2025, and then I filed my original charge of discrimination with the Missouri Commission on Human Rights & EEOC on or about June 25, 2025.

**MCHR FILED 11/19/2025**

7

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

## Continuing Retaliatory Action

Shortly after I filed my charge of discrimination, Enterprise retaliated against me further by presenting false information to the Missouri Division of Employment Security to protest my unemployment claim. Based on the false information Enterprise presented to the unemployment office, my claim was denied.

I appealed the denial, and there was a hearing conducted on August 14, 2025. Nobody from Enterprise even showed up for the hearing. After the hearing, the Appeals Tribunal found that my employer initiated my termination and reversed the denial.

On or about August 25, 2025, I began a new job in compliance with Enterprise's non-compete agreement. Since that time, Enterprise directors and vice presidents have continuously surveilled my LinkedIn profile, which I use for my current job. I believe that they are trying to gather information to falsely claim that my new job violates the non-compete agreement I signed in 2023, even though it does not, or to intimidate me, or impede the performance of my new job.

The harassing, discriminatory and retaliatory actions by Enterprise, its managers, and employees have caused me to suffer damages, including lost wages and benefits, pain and suffering, medically diagnosable emotional distress, embarrassment, humiliation, and harm to my personal and professional reputation. As a remedy, I am seeking an end to the discrimination, prejudice, and retaliation that Enterprise and its employees have subjected me to; that Enterprise cease and desist such unlawful and discriminatory acts; that steps are taken to protect me and other employees like me from the type of conduct described above; and from all other forms of discrimination and retaliation in the future. I also seek compensation for my pain, suffering, humiliation, embarrassment, emotional distress, the harm to my personal and professional reputation, and anything else the Commission deems just and proper.

**MCHR FILED 11/19/2025**

**26SL-CC04056**

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

MISSOURI DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS

# MISSOURI COMMISSION ON HUMAN RIGHTS

| **MIKE KEHOE** | **ANNA S. HUI** | **AL LI** | **SHANNON THOMPSON** |
|---|---|---|---|
| GOVERNOR | DEPARTMENT DIRECTOR | COMMISSION CHAIR | ACTING EXECUTIVE DIRECTOR |

March 2, 2026

Breann Heininger
3925 White Rose Lane
St. Charles, MO 63304
Via email:  l.e.beck@beckgrantlaw.com

### NOTICE OF RIGHT TO SUE

RE:  Heininger v. ELCO Administrative Services Company, E-06/25-57102; 28E-2025-00704

The Missouri Commission on Human Rights (MCHR) is terminating its proceedings and issuing this notice of your right to sue under the Missouri Human Rights Act because you have requested a notice of your right to sue.

This letter indicates your right to bring a civil action within 90 days of the date of this notice against the respondent(s) named in the complaint. Such an action may be brought in any circuit court in any county in which the unlawful discriminatory practice is alleged to have occurred, but it must be brought no later than two years after the alleged cause occurred or its reasonable discovery. Upon issuance of this notice, the MCHR is terminating all proceedings relating to the complaint. No person may file or reinstate a complaint with the MCHR after the issuance of a notice of right to sue relating to the same practice or act. You are hereby notified of your right to sue the Respondent(s) named in your compliant in state circuit court. **THIS MUST BE DONE WITHIN 90 DAYS OF THE DATE OF THIS NOTICE OR YOUR RIGHT TO SUE IS LOST.**

You are also notified that the Executive Director is hereby administratively closing this case and terminating all MCHR proceedings relating to it.  This notice of right to sue has no effect on the suit-filing period of any federal claims. This notice of right to sue is being issued as required by Section 213.111.1, RSMo, because it has been over 180 days after the filing of the complaint and MCHR has not completed its administrative processing.

Respectfully,

*Shannon Thompson*

Shannon Thompson
Acting Executive Director

CC:  Additional Contacts Listed on Next Page

**PLAINTIFF'S EXHIBIT**

**3**

_____

*The Missouri Commission on Human Rights is an equal opportunity employer/program.*
*Auxiliary aides and services are available upon request to individuals with disabilities.*

TDD/TTY: 1-800-735-2966    •    Relay Missouri: 711    •    www.labor.mo.gov/discrimination    •    Email: mchr@labor.mo.gov

26SL-CC04056

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

# EMPLOYMENT CONTRACT

This EMPLOYMENT CONTRACT is made and entered into this 1 day of September, 2023,

by and between _____ Breann Heininger _____
                          (Name of Employee)
(hereinafter called "Employee"), and ELCO Administrative Services Company____
                          (Subsidiary/Affiliate)
(hereinafter called "Employer").

The Employer owns and operates businesses which provide, among other services, automotive leasing; automotive rental; new and used (including remarketing, referral activities, wholesale and retail) vehicle sales; automotive and truck fleet management; special services to automotive fleet owners, lessors, collision industry services, insurance industry adjustors and/or agents, including, but not limited to, those services provided under the trade name "Claims Connection"; car sharing, ridesharing, ride hailing, ride matching, ride booking services, vanpool services; network management services and software, accident management services and software, data driven performance software development, parts pricing and procurement software services and/or development and automotive rental reservation centers (collectively "the Business").

Provided that Employee signs this Agreement, Employer agrees to pay employee a signing bonus of Two Hundred and Fifty Dollars and Zero Cents ($250.00), minus applicable deductions and withholdings ("Consideration Signing Bonus"). The Consideration Signing Bonus will be paid within thirty (30) days following Employee's execution of this Agreement and will be included on Employee's regular paycheck.

In consideration of the employment and/or the continued employment of the Employee, the Consideration Signing Bonus, the obligation of the Employer to provide the increased amount of payment to which Employee may be entitled under Paragraphs 12 and 13 hereof, and the mutual

3/21 Level III

1

PLAINTIFF'S
EXHIBIT

**4**

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

covenants and agreements contained herein, the sufficiency and adequacy of any of such factors being hereby recognized and agreed to, the parties contract as follows:

1.    The Employee is employed and/or retained by the Employer to aid, assist and manage the Employer in the sales and services rendered to clients and customers of the Employer's business. The parties acknowledge the highly competitive nature of said business. The parties also acknowledge that the automotive leasing business is highly competitive with the business of the sale of new automotive vehicles. Employee further recognizes and agrees that he/she has and/or will have direct access to competitively sensitive and protected policies, strategies and business plans of Employer.

2.    The clients of the business, as well as the customer lists, marketing plans, files, books, records, accounts, data processing information and computer stored information related to the business are the sole and exclusive property of the Employer and the Employee will safeguard all such property at all times so that it is not exposed to, or taken by, unauthorized persons.

3.    The Employee will not be liable for federal or state trade secret misappropriation if Employee discloses a trade secret: (a) in confidence to a federal, state, or local government official either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law; or (b) in any document filed under seal in a lawsuit or other proceeding. In addition, in the event of any lawsuit involving Employee and alleging retaliation for reporting a suspected violation of law, Employee may disclose the trade secret to Employee's own attorney, and use that information in the court proceeding, as long as any document containing the trade secret is filed under seal and Employee does not disclose the trade secret absent a court order.

4.    During his/her employment, the Employee will not at any time, either himself/herself

2

3/21 Level III

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

or through others, directly or indirectly, by any means or device whatsoever, solicit, divert, or attempt to solicit or divert clients, customers, sales or business from the Employer to, or for, any other business competitive with Employer or anyone.

5.    The Employee will not at any time, either himself/herself or through, or with the aid or assistance of others, take, disclose, misappropriate or misuse any marketing plans, client list, name, file, book, record, account, financial data or other information or confidential data used at or in any of the businesses managed, controlled or owned by the Employer. Employee agrees that any patents, inventions, copyrights or trade secrets developed by Employee during the course of his/her employment, together with any income of whatever nature received as a result thereof, become the exclusive property of Employer.

6.    During the term of employment, the Employee agrees that he/she will not either directly or indirectly work for or be associated with any business activity competitive in any way with Employer unless said relationship or employment is recognized, agreed to and approved in writing by the Employer prior to such other employment or association, and Employee agrees to reveal immediately to Employer any contact with, or inquiries from, a competitor regarding any such actual or proposed employment association. Further, Employee agrees to devote his/her full time and attention to the business and affairs of Employer and, at all times, to use his/her best efforts to promote the interests of the Employer and faithfully and efficiently to perform the responsibilities assigned to him/her to the fullest extent necessary to discharge such responsibilities. Further, Employee agrees that during his/her employment, he/she will not accept employment of any nature, including self employment, for which remuneration is received unless said employment is recognized, agreed to and approved in writing by the Employer prior to such other employment or

3

3/21 Level III

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

association. Employee also agrees he/she shall have no financial or other interest in any business entity which detracts from, or interferes with, Employee devoting his/her full time and attention to Employer's business without the prior, written permission of Employer.

7.     The Employee at all times recognizes and respects the advantageous business relationship which exists between Employer and present and potential clients who have been made aware of the procedures, businesses and services of the Employer.  The Employee expressly agrees effectively and enthusiastically to promote, and to do nothing to interfere with, those advantageous relationships during his/her employment with Employer or at any time thereafter as such is defined in Paragraphs 15 and 16 hereof.

8.     The Employee's duties shall be subject to the managerial control of officers, directors and senior management personnel of the Employer, and shall include such duties as the Employer may from time to time designate, change or redesignate.

9.     In consideration for services performed, the Employer shall pay the Employee the compensation as may be agreed upon for the position held by the Employee, or such other sum as may be mutually agreed upon from time to time by the parties.  Benefits paid to Employee shall be exclusively determined and/or modified from time to time by Employer.

10.    In any fiscal year of the Employer in which Employee is employed under this contract for less than the full fiscal year by reason of termination or resignation of employment, Employee shall be entitled to salary and contingent compensation, if any, only for the portion of the year in which he/she was actively employed unless otherwise provided herein.

11.    Upon termination of employment for any reason, the Employee shall immediately return to the Employer all of the Employer's property, including without limitation, automobiles,

4

3/21 Level III

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

files, lists, records and computer disks of the Employer and any other data used by the Employee or the Employer in rendering services hereunder, or otherwise, which may be in the Employee's possession or under the Employee's control, or to which the Employee has access without retaining any copies or computerized duplicates thereof.

12.    If Employee shall die while this contract is still in effect, his/her death shall automatically terminate the contract.  In such event, Employee shall be paid all base salary Employee would have been paid for the entire month of the Employee's death.  Employee shall also be paid Employee's monthly profit-based bonus, if any, pro-rated to the date of death.  Additional salary and contingent compensation, if any, equal to that received by Employee for the four (4) calendar months prior to the month of death shall also be paid or, if greater, an amount computed on the basis set forth in paragraph 13 hereof.  The payment of additional monthly base salary and contingent compensation after death shall be made in one lump sum to the person designated in writing as the Employee's beneficiary under the life insurance program of Enterprise Holdings, Inc., a Missouri corporation (hereinafter sometimes "corporate parent").  In the event no such designation is made, such amount shall be paid to Employee's probate estate.  Receipt by such designated beneficiary or Employee's probate estate shall constitute a complete discharge of Employer's obligations hereunder.  All other forms of benefits paid or provided to the Employee incident to his/her employment shall cease upon the death of the Employee, except as otherwise required by law.

13.    Employee's employment shall be terminable at any time at the option of the Employee for any reason he/she may elect, but in such event, Employee shall not be entitled to any severance benefit.  Employee's employment may be involuntarily terminated by Employer for any

5

3/21 Level III

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

reason whatsoever, which it, at its sole option, may elect. In the event employment is involuntarily terminated by Employer, Employee shall be paid a severance benefit in an amount equal to thirty percent (30%) of the compensation for services and contingent compensation, if any, earned by him/her during the twelve full calendar months immediately preceding the month of such termination. Except as provided in paragraph 13(iii) below, partial payment will commence within forty-five (45) days of the date of termination and satisfaction of the condition described in (i) below and partial payments will each be in a sum equal to one-sixth (1/6th) of the total amount to be paid hereunder and will be paid bi-weekly until the full amount has been paid. All sums specified to be paid under this contract shall be less standard payroll deductions and, subject to the provisions of paragraph 13(iii) below, all sums specified to be paid, if all conditions for payment have been satisfied, will be completed no later than within five (5) months following the date of termination. Notwithstanding any provision in this paragraph or contract to the contrary, if Employee engages, or has engaged, in any conduct which Employer, at its sole option, determines is inconsistent with the best interests of the Employer, all payments (or any remaining payments) under this Paragraph will be forfeited. All other forms of benefits paid or provided to the Employee incident to his/her employment shall cease on the date of termination of employment, except as otherwise required by law. This paragraph shall not apply, and any obligation of Employer under this Paragraph shall cease, in the event Employee is offered, and accepts, other employment with Employer or any domestic or foreign subsidiary or affiliate of Enterprise Holdings, Inc., a Missouri corporation. Furthermore, in the event Employee is demoted to a position within the Employer's pay plan Level II, this paragraph shall not become operative and, upon such demotion, Employer's obligations under this Employment Contract shall terminate.

6

3/21 Level III

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

As a precondition to receiving and retaining the payments to be made in this paragraph 13, and in consideration of the severance benefits specified herein and subject to paragraph 13(iii) also, Employee will:

(i)    execute and deliver to the Employer within twenty-one (21) days or forty-five (45) (if required by applicable law) after presentation and not revoke such execution, a document in form and substance satisfactory to Employer (which shall be presented to Employee no later than ten (10) days following the date of Employee's termination of employment) accepting the severance payment with conditions as prescribed by Employer in full satisfaction of any and all claims which the Employee may have against the Employer, its corporate parent or any of its affiliated companies, or any of their respective agents, officers, directors, shareholders or employees (the "Employer parties") and releasing the Employer parties from any and all claims, injuries and damages from any matter whatsoever since the beginning of time including, but not limited to, matters arising out of Employee's employment with the Employer or the termination thereof and any conduct of any of the Employer parties based upon this contract or any custom, practice or policy of the Employer, its corporate parent or any of its affiliated companies (exclusive of the payments and benefits provided for under this contract) and agreeing not to disparage or denigrate any of the Employer parties; and

(ii)    provide reasonable consultation, cooperation and assistance as and when reasonably requested with respect to matters in which Employee was involved or had knowledge of during his/her employment with Employer, voluntarily appear without a subpoena to testify in any legal proceeding, meet with Employer counsel prior to such testimony as and when reasonably requested and advise counsel truthfully of all facts known to Employee.

(iii)    In the event that the amounts described in paragraph 13 and 13(i) are determined by

7

3/21 Level III

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

the Employer to be deferred compensation subject to Internal Revenue Code Section 409A and not subject to exclusion from its applicability, then this paragraph 13(iii) shall apply to such payment. If it is possible that the process specified in paragraph 13(i) for the execution, delivery and possible revocation of the document could be completed in the calendar year following presentment, then commencement of the payments described in paragraph 13 and 13(i) shall not begin until the later of (A) the Employer's first pay period occurring during such following calendar year or (B) the first pay period during the following calendar year that occurs following the presentation, execution and delivery of the document described in paragraph 13(i) and the expiration of any applicable revocation period specified therein. In any event, such payments shall then be completed no later than within six (6) months following the commencement of such following calendar year.

Failure to execute and deliver to Employer, and not revoke, the document identified in (i) above within the time frame provided for execution and delivery shall result in forfeiture of the severance benefit described in this paragraph 13.

14.    All payments made pursuant to this Agreement shall be subject to withholding of such income and other taxes that Employer determines, in its judgment, should be withheld. All individual and personal income, employment and other tax liabilities and tax effects of any payments made hereunder shall be the exclusive liability and responsibility of Employee.

The intent of the parties is that payments and benefits under this Agreement comply with or be exempt from Section 409A of the Code and the regulations and guidance promulgated thereunder (collectively "Code Section 409A"), and this Agreement and any associated documents shall be interpreted and construed in a manner that establishes an exemption from (or compliance with) the requirements of Code Section 409A. If any provision of this Agreement would cause the Employee

8

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

to incur any additional tax or interest under Code Section 409A, the Company may, after consulting with Employee, interpret or reform such provision in a manner intended to avoid the incurrence by Employee of any such additional tax or interest; provided that the Company agrees to maintain, to the maximum extent practicable, the original intent and economic benefit to Employee of the applicable provision without violating the provisions of Code Section 409A.

For purposes of Code Section 409A, Employee's right to receive any installment payments shall be treated as a right to receive a series of separate payments. Whenever a payment hereunder specifies a payment period with reference to a number of days, e.g. "payment shall be made within forty-five (45) days following the date of termination", the date of payment within the specified period shall be within the sole discretion of the Employer. Employer may not directly, or indirectly, designate the calendar year of any payment to be made hereunder this Agreement, to the extent such payment is subject to Code Section 409A.

The Employer makes no representation or warranty and shall have no liability to the Executive or any other person if any provisions of this Agreement are determined to constitute deferred compensation subject to Code Section 409A, but do not satisfy an exemption from Code Section 409A. The Parties hereto further agree that any penalties, taxes or interest arising as the result of application of the provisions of Code Section 409A shall not be the responsibility of the Employer; and, Employee shall be exclusively liable for such amounts.

15. Upon termination or resignation of employment for any reason, during the period of two years from and after the date of termination or resignation, Employee will not directly or indirectly within a 150 mile radius of any office of the Employer in which Employee has been employed or had supervised during the two years preceding the date of such termination or

9

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

resignation, enter into or engage in the previously specified businesses of Employer in like or similar duties, capacities, responsibilities or activities (which includes activities directly or indirectly supervised or about which Employee had proprietary information) which he/she performed for Employer, the corporate parent or any of corporate parent's subsidiaries, as a sole proprietor, joint venturer, partner, employee, advisor, consultant, officer, director, shareholders, investor or otherwise of or to any company, person or entity. The provisions of this paragraph shall not prevent Employee from owning, solely as a passive investor, up to three percent (3%) of the issued and outstanding publicly traded class of stock of any corporation who securities are traded on any national securities exchange or are actively traded in the over-the-counter market, prices for which regularly are quoted in a daily publication of general circulation. Employee further agrees the provisions of this paragraph 15 are reasonable in all respects, necessary to protect the Employer's legitimate business interests and will not in any way prevent Employee from earning a living.

16.    During his/her employment and for two (2) years following termination or resignation of employment for any reason, Employee will not either himself/herself or in aid of or through others, solicit, divert, or attempt to solicit or divert other employees of Employer to terminate or modify their employment relationship with Employer or to have such employee(s) perform any services for or on behalf of another firm.

During his/her employment and for two (2) years following termination or resignation of employment for any reason, Employee will not directly or through others divert or attempt to divert current or former customers of Employer, which former customers were customers of Employer within the two years immediately preceding termination or resignation of employment, to terminate, modify or not renew their business relationship with Employer.

10

3/21 Level III

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

17.    The Employee acknowledges that the damages which will be suffered by the Employer by a breach of any term or provision of paragraphs 4, 5, 6, 7, 11, 15 and 16 may be continuing, and that the harm might result to Employer as a result of Employee's breach would be largely irreparable and difficult to ascertain in monetary worth.  Consequently, in addition to any action at law for damages, he/she agrees the Employer may have equitable relief, including specific performance and injunction, to insure and enforce his/her performance of and adherence to such obligations to which he/she has voluntarily agreed, and that he/she shall be responsible for reasonable attorney's fees, costs and expenses incurred by the Employer in connection with such action.  In addition to any other legal or equitable remedy available to Employer, in the event any Court finds Employee has violated any provision of this contract or any agreement/document executed by Employee pursuant to paragraph 13(i), upon Employer's written demand, Employee agrees to return to Employer any sum previously paid under paragraph 13 hereof.

18.    This contract supersedes and cancels any prior oral or written agreements between Employee and Employer concerning the subject matters hereof.  It cannot be modified, amended or changed except by a subsequent written agreement signed by the parties.  It is agreed that no other past, present or future employment policy, program, benefit or statement of Employer, its corporate parent or any of their officers, agents or representatives shall operate to modify, or in any manner supersede, the terms of this employment contract.

19.    Notwithstanding the provisions of any present or future promissory note or other evidence of indebtedness to the contrary, Employee agrees that any monies due Employer and/or Enterprise Holdings, Inc., a Missouri corporation, will become payable in full at the date of his or her termination or resignation of employment or death and Employee hereby authorizes deduction of

11

3/21 Level III

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

any such sum from any payments to be made under paragraphs 12 or 13 until such indebtedness has been extinguished.

20.    The waiver by Employer of the breach of any provision of this agreement by the Employee shall not operate or be construed as a waiver of any subsequent breach by Employee.

21.    For purposes of this contract and all applicable laws, Employee agrees that his/her employment relationship is solely and exclusively with Employer and not with any other entity, whether or not legally related to Employer herein.

22.    Nothing contained in this contract shall be construed to require the commission of any act contrary to law or to be contrary to law, and wherever there is any conflict between any provision of this contract and any present or future statute, law, governmental regulations or ordinances contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event, the provisions of this contract affected shall be curtailed and restricted only to the extent necessary to bring them within legal requirements.

23.    The parties agree that should either signator to this contract have a change in name, this contract shall continue and need not be re-executed in order to incorporate such name change.

24.    The parties have caused this contract to be executed in duplicate the day and year first above written.  The Employee agrees he/she has read this contract, fully understands its terms, conditions, limitations and restrictions and voluntarily agrees to all of its provisions including, but not limited to, the geographical and time limitations contained in paragraphs 15 and 16.

Employee Signature

ELCO Administrative Services Company
Name of Corporation/Subsidiary/Affiliate

By: _____

12

3/21 Level III

Electronically Filed - St Louis County - May 29, 2026 - 02:45 PM

Signature of Officer of
Corporation/Subsidiary/Affiliate


Its Vice President-Liability Claims
Title of Officer of
Corporation/Subsidiary/Affiliate

13

3/21 Level III



# Summons in Civil Case

## IN THE 21ST JUDICIAL CIRCUIT, ST. LOUIS COUNTY, MISSOURI

| Judge or Division:<br>HEATHER RENE CUNNINGHAM | Case Number:  26SL-CC04056 | |
|---|---|---|
| Plaintiff/Petitioner:<br>BREANN HEININGER | Plaintiff's/Petitioner's Attorney/Address<br>LEAH ELIZABETH BECK<br>4571 LACLEDE AVE<br>UNIT 284<br>ST. LOUIS, MO  63108 | |
| vs. | | |
| Defendant/Respondent:<br> ELCO ADMINISTRATIVE SERVICES COMPANY | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 | (Date File Stamp for Return) |
| Nature of Suit:<br>CC Employmnt Discrmntn 213.111 | | |

The State of Missouri to:    ELCO ADMINISTRATIVE SERVICES COMPANY
Alias:
**CT CORPORATION SYSTEM**
**5661 TELEGRAPH RD STE 4B**
**SAINT LOUIS, MO  63129**

**Other Addresses:**

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

*COURT SEAL OF*

*ST. LOUIS COUNTY*

| 01-JUN-2026 | /S/ Adam Dockery |
|---|---|
| Date | Clerk |

**Further Information:**
AD

SJRC (07-25) SM30 (SMCC) *For Court Use Only:* **Document ID # 26-SMCC-7580**
1 of 2 (26SL-CC04056)                 Civil Procedure Form No. 1, SCR 54.01 – 54.05,
54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo

**Case Number: 26SL-CC04056**

## Officer's or Server's Return

**Note to serving officer**: Service should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by: (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.

☐ leaving a copy of the summons and petition at the dwelling house or usual place of abode of the

defendant/respondent with _____, a person at least 18 years

of age residing therein.

☐ (for service on a corporation) delivering a copy of the summons and petition to:

_____ (name) _____ (title).

☐ other: _____.

Served at _____ (address)

in _____ (County/City of St. Louis), MO, on _____ (date)

at _____ (time).

_____        _____
Printed Name of Officer or Server                Signature of Officer or Server

**Must be sworn before a notary public if not served by an authorized officer.**
Subscribed and sworn to before me on _____ (date).

*(Seal)*

My commission expires: _____  _____
                                            Date                          Notary Public

A copy of the summons and petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

**THE CIRCUIT COURT OF ST.  LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

**NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES**

**Purpose of Notice**

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case.   However, most lawsuits are settled by the parties before a trial takes place.  This is often true even when the parties initially believe that settlement is not possible.  A settlement reduces the expense and inconvenience of litigation.  It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost.   Often such services are most effective in reducing costs if used early in the course of a lawsuit.  Your attorney can aid you in deciding whether and when such services would be helpful in your case.

**Your Rights and Obligations in Court Are Not Affected By This Notice**

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so.  In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below.   These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended.  Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not.  **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

**Alternative Dispute Resolution Procedures**

There are several procedures designed to help parties settle lawsuits.   Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party.   The services are provided by individuals and organizations who may charge a fee for this help.   Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case.   The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit.  An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties.  The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

CCADM73

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement.  An effective mediator may offer solutions that have not been considered by the parties or their lawyers.  A mediator may not impose his or her own judgment on the issues for that of the parties.

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 105 South Central Avenue, 5th Floor, Clayton, Missouri 63105.  The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms.  You should ask your lawyer for further information.

CCADM73



**OFFICE OF THE CIRCUIT CLERK**

Missouri's 21st Judicial Circuit, St. Louis County
Civil Department
105 South Central Avenue, Clayton, MO 63105
Hours: Monday through Friday 8:00 A.M. to 5:00 P.M.
Phone: 314-615-8029


SPECIAL NEEDS: If you have special needs addressed by the Americans With Disabilities Act. Please notify the Office of the Circuit Clerk at 314-615-8029. FAX 314-615-8739, email at SLCADA@courts.mo.gov, or through Relay Missouri by dialing 711 0r 800-735-2966, at least three business days in advance of the court proceeding.

Electronically Filed - ST LOUIS COUNTY - June 15, 2026 - 10:55 AM



# Summons in Civil Case

## IN THE 21ST JUDICIAL CIRCUIT, ST. LOUIS COUNTY, MISSOURI

# RETURN

Tracking # 2600031711

SB
7-1

| | |
|---|---|
| Judge or Division:<br>HEATHER RENE CUNNINGHAM | Case Number:  26SL-CC04056 |
| Plaintiff/Petitioner:<br>BREANN HEININGER | Plaintiff's/Petitioner's Attorney/Address<br>LEAH ELIZABETH BECK<br>4571 LACLEDE AVE<br>UNIT 284<br>vs.    ST. LOUIS, MO  63108 |
| Defendant/Respondent:<br> ELCO ADMINISTRATIVE SERVICES<br>COMPANY | Court Address:<br>ST LOUIS COUNTY COURT BUILDING<br>105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 |
| Nature of Suit:<br>CC Employmnt Discrmntn 213.111 | |

(Date File Stamp for Return)

The State of Missouri to:   **ELCO ADMINISTRATIVE SERVICES COMPANY**

Alias:                                                          30
CT CORPORATION SYSTEM                 CTCOR
5661 TELEGRAPH RD STE 4B               SW.
SAINT LOUIS, MO  63129

**Other Addresses:**

You are summoned to appear before this court and to file your pleading to the petition, a copy of which is attached, and to serve a copy of your pleading upon the attorney for plaintiff/petitioner at the above address all within 30 days after receiving this summons, exclusive of the day of service. If you fail to file your pleading, judgment by default may be taken against you for the relief demanded in the petition.

**COURT SEAL OF**



**ST. LOUIS COUNTY**

| 01-JUN-2026 | /S/ Adam Dockery |
|---|---|
| Date | Clerk |

**Further Information:**
AD

√√SB 26-5

Case Number: 26SL-CC04056

Electronically Filed - ST LOUIS COUNTY - June 15, 2026 - 10:55 AM

### Officer's or Server's Return

**Note to serving officer**: Service should be returned to the court within 30 days after the date of issue.

I certify that I have served the above Summons by: (check one)

☐ delivering a copy of the summons and petition to the defendant/respondent.

☐ leaving a copy of the summons and petition at the dwelling house or usual place of abode of the defendant/respondent with _____, a person at least 18 years of age residing therein.

☑ (for service on a corporation) delivering a copy of the summons and petition to:

_____ _Pm_ _____ (name) _Intake Specialist_ (title).

☑ other: _CT Corporation System_ .

Served at _56661 Telegraph Rd., Ste. 4B, St. Louis, MO 63129_ (address) in _St. Louis_ (County/City of St. Louis), MO, on _6/9/2026_ (date) at _9:20_ (time).

_____ _KEVIN BEHG_ _____     _____ (signature) _____
Printed Name of Officer or Server       Signature of Officer or Server

**Must be sworn before a notary public if not served by an authorized officer.**
Subscribed and sworn to before me on _____ (date).

(Seal)

My commission expires: _____ _____
              Date              Notary Public

A copy of the summons and petition must be served on **each** defendant/respondent. For methods of service on all classes of suits, see Supreme Court Rule 54.

SJRC (07-25) SM30 (SMCC) *For Court Use Only:* **Document ID # 26-SMCC-7580**
2 of 2 (26SL-CC04056)           Civil Procedure Form No. 1, SCR 54.01 – 54.05,
54.13, and 54.20; 506.120 – 506.140, and 506.150 RSMo